**LYON**

v.

**BAUSCH & LOMB OPTICAL CO.**
Civ. No. 4168.

United States District Court
W. D. New York.
Dec. 31, 1953.

B. Edward Shlesinger, Rochester, N. Y., Cushman, Darby & Cushman, Washington, D. C., John W. Malley, C. Willard Hayes, Washington, D. C., of counsel, for plaintiff.

Edward H. Cumpston, Rochester, N. Y., G. A. Ellestad, Rochester, N. Y., of counsel, for defendant.

BURKE, District Judge.

This case involves a claim for damages based upon the alleged infringement of plaintiff's patent No. 2,398,382 on a method for applying hard, durable, low-reflecting films of inorganic salts on the surfaces of optical elements. At the trial the complaint was amended to add a claim for damages for unjust enrichment. The invention covered by the patent is an improvement in the art of applying a stable, water-insoluble, evaporated, inorganic salt coating (notably magnesium fluoride) on the surfaces of optical elements. Prior to the invention optical elements had been coated with such materials but the coatings had not been consistently rugged and durable. Handling, usage, and climatic conditions had tended to damage or remove the coatings. The plaintiff's method provides for the formation of a consistently hard, durable and tenacious coating by heating the optical surfaces to an elevated temperature while they are in a vacuum chamber, such as a bell jar, and in evaporating suitable inorganic salts to the optical surfaces in the vacuum chamber while the surfaces are maintained at an elevated temperature. The need for such rugged coatings had been felt in the art since the time it was first learned that such evaporated coatings would add to the efficiency of optical elements. The lack of consistent ruggedness of the coatings had imposed inherent limitations on their use in the industry. It had been generally regarded as necessary to limit the use of coatings to inside surfaces where they were protected from handling and to leave the outside surfaces uncoated because of the risk of damage to unprotected surfaces. Prior invention had provided means for hardening the coated surfaces by baking the optical elements in air after they had been removed from the vacuum chamber. This method was commonly referred to as post-baking. Prior methods had also been used to pre-heat the optical elements to clean them before they were placed in the vacuum chamber. Means had also been used to get a com-

pletely clean condition within the vacuum chamber by creating an electrical discharge in the vacuum chamber, known as "glow discharge." All of such prior methods left much to be desired in respect to the quality of ruggedness and durability of the coated surfaces.

In the latter part of 1940 the Naval Gun Factory at Washington was interested in putting into production on a mass scale the coating of optical elements for the Navy. It had been discovered by naval authorities from examination of a German bombsight in 1940 that the Germans had been coating optical elements for at least 2 years. The plaintiff had had some experience in the technique of applying coated films in vacuum. He was hired as a civilian employee at the Naval Gun Factory to develop for the Navy a program in setting up the production of coated optical elements for Navy use. He reported for work in January of 1941. After experimenting with the known methods of hardening evaporated films he concluded that the films so produced were too soft for Navy use. During the course of his experiments at the Naval Gun Factory in June of 1941 he hit upon the idea of heating the optical elements to be coated in the vacuum chamber and maintaining the heated condition of the elements while the evaporated coating was being applied in the vacuum. Further experiments along this line convinced him that the use of this method of hardening the coatings provided consistent hardness and adherence of thin films so applied. After repeated tests for hardness and durability, and after the application of the process to actual optical instruments such as binoculars and submarine periscopes, the method was eventually applied to practically every type of optical instrument used by the Navy. It was also adopted by the War Department for the Army and after the Second World War by the optical industry generally. Plaintiff's application for a patent was filed November 17, 1942. The patent was granted April 16, 1946.

The defendant was engaged during the Second World War in performing contracts with the United States Government for the manufacture of optical instruments for the Army and Navy. In connection with its work under such contracts officials of the defendant visited the Naval Gun Factory in 1942 and inspected the work being done there with the plaintiff's process in the coating of optical elements for the purpose of adopting it in its manufacture of optical instruments for government use under its contracts. As required by its contracts with the Government, it coated optical elements produced for the Government using the plaintiff's method for hardening the coatings. After the Second World War the defendant continued to use plaintiff's method for coating optical elements in its commercial manufacture of optics not made for use of the Government. Plaintiff's offer of a license under his patent to the defendant for its use in its commercial manufacture of optics was rejected. Hence this suit.

Defendant asserts that the patent is invalid for lack of novelty and invention over prior patents cited by the Examiner. Plaintiff's patent specification shows prior knowledge of metallic fluoride reflection-reducing films and the practice of pre-heating the surface to be coated to improve the tenacity of the film to the surface and to improve the ruggedness of the film itself. It also shows prior knowledge of post-baking in air to improve the tenacity and ruggedness of light transmission films. Heating in the vacuum chamber, while a coating is being evaporated onto the optical surface, had not been disclosed in the art of applying inorganic salts to an optical surface. Darrah (Patent No. 1,224,339) disclosed coating a hot metal powder such as aluminum or zinc onto a hot metal base such as iron in the presence of a partial vacuum. The coating metal is absorbed into the metal base. Cartwright (Patent No. 2,281,474) disclosed the method of coating an optical element with a reflection-reducing inor-

ganic salt such as magnesium fluoride by evaporating in vacuum. He follows this treatment in vacuum by post-baking in air to harden the coating. Sabine (Patent No. 2,301,456) refers by inference to the post-baking in air used by Cartwright. Prior patents (Macksoud No. 2,217,228 and Birdseye No. 2,237,328) had disclosed the simultaneous heating and coating of the inside of a lamp bulb in a vacuum with an evaporated metallic coating. These two patents related to the use of metals to form opaque, reflective coatings in a field not related to the art of coating optical elements. It was not obvious to those working in the field of coating optical elements with thin films of inorganic salts to use the step of heating in the vacuum shown by Macksoud and Birdseye working in a different field with metals. The plaintiff's method of hardening the coated optical surface provided an improved, durable and tenacious coating such as had never been obtained by prior patentees. Plaintiff's process removed the inherent limitations of the use of coated optics to protected surfaces and made such use available for general application, including application to external and unprotected optical surfaces without risk of damage from assembling, handling, usage and atmospheric or climatic conditions. This was a distinct advance in the art. All of the patents referred to above were considered by the Examiner in the Patent Office. Plaintiff's disclosure was addressed to the problem of soft coatings, coatings too fragile to permit their use in general application in the optical industry because of the risk of damage to the coatings from ordinary usage and handling and atmospheric conditions. Plaintiff's method of hardening was a successful solution of the problem. The presumption of novelty and invention is strengthened since the patents relied on to show lack of invention were considered by the Examiner. There was no showing at the trial that the Examiner was wrong in his conclusion. J. A. Mohr & Son v. Alliance Securities Co., 9 Cir., 14 F.2d 799; Celanese Corp. v. Essley Shirt Co., 2 Cir., 98 F.2d 895.

Defendant asserts that the patent is invalid by reason of patents, publications, and admissions of the plaintiff at the trial, which material was not before the Examiner. Cartwright (Patent No. 2,281,475) disclosed both pre-heating the optical surfaces prior to evaporating the coating in the vacuum and post-baking the metallic salt coating. Biggs (Patent No. 2,123,706) disclosed heating in the vacuum during evaporation of metal on the inside of a lamp bulb. Fink (Patent No. 1,738,991) disclosed the use of the same process to coat with metal the inner surface of a thermos bottle to produce a reflective coating. Winkler (Patent No. 1,982,774) disclosed the same process with metal to coat mirrors. It also referred to post-baking in air and to electrical discharge in vacuum. Long (Patent No. 2,236,911) also dealt with coatings of metal on mirrors to make a reflective coating. The publication of Burgers & Dipple (1934) is an academic study to determine the structure of films of inorganic salts to determine their structure. Post-baking is referred to. There is no mention of hardness or of the intent to harden the coatings. Cartwright, the patentee in patents already referred to, was co-author with Strong of an article entitled "An Apparatus for the Evaporation of Various Materials in High Vacua." This article was published in "Review of Scientific Instruments", Volume 2, March, 1931. This article does not disclose any heating in vacuum as a part of a method to secure films of inorganic salts. The reference to the use of heating in vacuum is in connection with the deposition of silver on glass to make a reflective coating. It is significant that Cartwright was still advocating the use of post-baking optical surfaces coated with inorganic salts at the time the plaintiff claims to have made his discovery of heating in vacuum. This was ten years later than the publication of the article above referred to. If this article can be said to suggest the advantages of heating in the vac-

uum in applying coatings of inorganic salts to optical elements it seems strange that Cartwright himself did not use it. He himself applied for a patent on the inferior and now virtually abandoned method of post-baking long after the publication of the article. Cartwright wrote another article which was published in "Review of Scientific Instruments", Volume One, December, 1930, entitled "Cathode Sputtering." Cartwright admitted in his testimony at the trial the difference between evaporation coating and sputtering is fundamental and that inorganic salts cannot be applied by sputtering.

The defendant asserts that the patent is invalid because of prior invention, knowledge, use and public use by Cartwright. There is no gainsaying the fact that Cartwright was outstanding in the field of coating optics, nor that he had experimented to discover means of hardening the coatings, nor that the particular process of heating in the vacuum had come to his attention prior to 1941. These admissions pose important questions, i. e., whether Cartwright properly estimated the value of heating in the vacuum to harden the coatings, and if he did properly estimate its value, whether he brought it to light in the art and urged its adoption. In November, 1939 Cartwright was an instructor at Massachusetts Institute of Technology in the field of physics. As early as November 8, 1939 he had devised a crude apparatus consisting of a metal plate with grooves to receive glass lantern slides to be coated. The plate was heated to various temperatures. Glass slides were inserted in the grooves in contact with the hot metal plate, which was then suspended in a vacuum chamber. By this means the heat of the glass slides was preserved in the vacuum while evaporated coatings of inorganic salts were applied to the slides. The results of Cartwright's experiments with this apparatus were reported in a letter by Cartwright to Mr. Carroll Wilson of Research Corporation, New York City, dated November 30, 1939. Attached to that letter was another page marked "continued December 4, 1939." This latter page referred to equipment for heating glass by radiation while the glass was being treated in vacuum. He reported that "this looks like the logical way to treat photographic lenses during their manufacture as well as eye glasses." Research Corporation as assignee was exploiting by licenses certain of Cartwright's patents, including his patent covering post-baking, under an arrangement by which the proceeds were used for research and under which Cartwright received some financial benefit. While Cartwright was at M.I.T. he carried on as a side line a small scale commercial business of coating optical elements for persons and corporations who had become familiar with his work. He devised a crude copper oven open at both ends, containing heating coils, designed to heat lenses electrically while under vacuum. This oven would accommodate one or two lenses. In connection with this commercial work he hired a student named Clark to assist him. This commercial work was carried on in an M. I.T. laboratory when students were not using the laboratory. Clark hardened the coatings by post-baking and on occasions by heating in the vacuum, using the copper oven. This was during the scholastic year ending in May, 1940. Clark was then hired by National Research Corporation, Boston, (not to be confused with Research Corporation) in charge of the development of lens coating. He was hired because of his experience in high vacuum work and his knowledge of coating lenses. When he was about to leave M.I.T. to go to National Research Corporation, he had a discussion with Cartwright regarding the method of vacuum heating for hardening coated lenses. Cartwright regarded National Research Corporation as a potential competitor of his in his commercial enterprise. Cartwright told Clark that he wanted to work on the method of heating in vacuum a little more and did not want it to be known publicly at that time (May, 1940). He

asked Clark not to divulge this method of coating at that time. Clark complied with Cartwright's request, and although employed at National Research Corporation until October, 1942, he never used nor disclosed any method for hardening except post-baking. His calculated suppression of the idea and of the use of heating in the vacuum was directly attributable to Cartwright's request to Clark not to divulge the idea because Cartwright did not want it to be known publicly.

In May of 1940, at the particular time that Cartwright expressed to Clark his desire that the idea of heating in the vacuum to harden coatings should not become public knowledge, the Navy was interested in the application of thin films to submarine periscopes. Cartwright left M.I.T. about August 1, 1940 to take a position as the head of the research department at Corning Glass Works. But before commencing his work at Corning Glass Works he was hired under contract with the Navy for compensation to go to the Naval Research Laboratory at Washington for one month to install for the Navy a technique in coating optical elements and to instruct personnel of the Naval Research Laboratory in the basic principles of high vacuum technique and anti-reflection coatings. He spent the month of August, 1940 at the Naval Research Laboratory in Washington. He took with him vacuum equipment that he had constructed for use in his employment at the Naval Research Laboratory. While there under contract he coated the lenses of a submarine periscope. These coatings were hardened by post-baking only. They turned out to be soft and unsuitable and could be brushed off with a camel's hair brush. As far as hardness was concerned, they were a failure. Cartwright says the reason for their lack of hardness was his inability to secure a good vacuum in the short time that he was employed at the Naval Research Laboratory. It is important to note however that Cartwright did not take to Washington for use in his employment at the Naval Research Laboratory his crudely constructed copper oven or any other equipment designed for use in heating in vacuum for hardening, and that he never intended to use the method of heating the lenses in vacuum for hardening the coatings during his work at the Naval Research Laboratory. At no time during his work there did he ever disclose to anyone the idea that evaporated coatings could be made more rugged by the use of heating in the vacuum.

Directly after his work at Naval Research Laboratory in August, 1940, he commenced his employment at Corning Glass Works. He supplemented his salary there by continuing his commercial enterprise of coating lenses. This work he did with the assistance of his wife in the basement of his home, and she usually applied the coatings. The testimony of Cartwright and his wife regarding the use of heating in the vacuum for hardening in his commercial work at Corning prior to Lyon's claimed invention is vague, uncertain, unsupported by any documentary evidence, (although there is documentary evidence of post-baking) and unpersuasive. This proof of anticipation does not measure up to the quality of proof required to defeat a patent. The Barbed Wire Patent, Washburn & Moen Mfg. Co. v. Beat Em All Barbed Wire Co., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154. On all the evidence regarding Cartwright's experiments, and his work with heating in the vacuum for hardening evaporated coatings, I conclude that Cartwright did not appreciate the benefits of heating in the vacuum, and that any such use by him was sporadic and inconclusive as to any definite advantages obtainable. He did not properly evaluate the results obtainable by heating in the vacuum to harden evaporated coatings. Certainly he did not bring it to light in the art, nor urge its adoption. Quite the contrary, the suppression of whatever Cartwright had discovered regarding the use of heating in the vacuum was due to his own efforts to withhold it from public knowl-

edge and to his own failure to disclose it in his work at Naval Research Laboratory when he was under contract for compensation to give the United States Navy the benefit of whatever knowledge he had that could be used in applying evaporated coatings to optical elements for the Navy. I am not persuaded by the evidence that Cartwright concealed or withheld the idea and use of heating in the vacuum for hardening with knowledge that that was the best method for obtaining hard and rugged coatings. I think rather that whatever experiments he had conducted along that line and whatever occasional use he had made of it in his commercial work had convinced him that it was inferior in results to his own patented post-baking method, and that the results obtained were not worth the effort, and did not warrant bringing it to light in the art. Even to-day when virtually the whole industry has abandoned post-baking, Cartwright is still not convinced that heating in the vacuum is superior to post-baking. His testimony at the trial leaves no doubt about the fact that he is still uncertain whether one "could not get as hard a film if you left out the actual heating in the vacuum." And he admitted in his testimony at the trial that that was the way he felt about it in 1940 and 1941. Since Cartwright's use did not in fact contribute to the art, he should not be deemed a "first inventor" of the process. Gillman v. Stern, 2 Cir., 114 F.2d 28, 31.

Cartwright was not alone in attempting to improve the quality of ruggedness of evaporated coatings. Hewlett, a distinguished scientest employed in research at General Electric Company, began intensive work directed to the improvement of non-reflecting films on glass in January, 1938. One of the problems with which he was confronted early in his work was that of making the coatings more durable. Some time in 1940 he conducted experiments using heat in the vacuum while the coatings were being evaporated onto glass. His immediate interest at that time was in connection with the development of a non-reflecting glass cover for photographic light meters. In all of his experiments in which he used heat in the vacuum during evaporation, he used it in connection with other steps designed to improve the ruggedness of the coatings, including pre-heating and post-baking in air. None of his experiments were designed to show the results of heating in the vacuum alone. His final experiment using heat in the vacuum conducted on July 30, 1940 was designed to answer the question whether it is necessary to have the glass plate hot while it is receiving the evaporated coating. In this experiment he also used pre-heating and post-baking in air. He concluded by this final experiment that heat in the vacuum was not a necessary step and thereafter he made no attempt to incorporate that step in his work of making non-reflecting films. As a result of his experiments Hewlett concluded that pre-heating, the securing of a high degree of vacuum, and post-baking were the important steps to secure rugged films, and that having performed those steps he regarded heating in the vacuum as an unnecessary step, and he therefore abandoned any further efforts in the use of heating in the vacuum. It is interesting to note that Dr. Hewlett's diary contained an entry dated July 28, 1940, two days before Dr. Hewlett's final experiment which led to the abandonment of the step of heating in the vacuum, which recited that Dr. Coolidge (one of Hewlett's associates at General Electric) had written to Cartwright's representatives to find out the details of Cartwright's procedure for hardening and waterproofing films. The reply to the request was a short communication stating the essential points to be (1) pre-heating; (2) post-baking; (3) cooling the glass and the immediate application of a waterproofing agent. No reference was made to the use of heat in the vacuum. This was immediately prior to Cartwright's employment at the Naval Research Laboratory. Cartwright had previously used heating in the vacuum

along with his post-baking and had so informed Hewlett in November, 1939. Cartwright's reply referred to in Hewlett's diary lends support to the conclusion that Cartwright did not properly evaluate the advantages of heating in the vacuum and that by July of 1940 he also had abandoned its use. This would explain Cartwright's failure to disclose the idea of heating in the vacuum during his employment at Naval Research Laboratory in August of 1940. Unlike the inventor in Corona Cord Tire Co. v. Dovan Chemical Corp.; 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, relied on by defendant, Hewlett did not reduce the use of heating in the vacuum to practice so as to demonstrate the practicability of the process. His experiments led him to the exact opposite conclusion, namely that it was not practicable and he therefore abandoned it.

Joseph Beggs was employed at Eastman Kodak Company. From the Fall of 1939 to the Fall of 1940 he was employed in the laboratory at Kodak's Hawkeye Division, where work on non-reflecting films on lenses was being carried on. Up to that time Kodak's work on hardening magnesium fluoride coatings had been done mainly by post-baking. The coatings produced were still not hard enough to withstand ordinary cleaning methods. The use of coatings was therefore restricted mainly to inside surfaces. Beggs conducted one experiment using heat in the vacuum for hardening. He utilized the tungsten filament of an incadescent lamp bulb to supply the heat. He said this method produced a harder coating than the post-baking method. If any appreciable advantage was uncovered from Begg's experiment, it had no discernable impact on Kodak's methods of hardening. Apparently the result of Begg's experiment went unnoticed by his superiors responsible for Kodak's program for coating lenses. There was no activity in the Kodak laboratory involving the use of heat in the vacuum from the time of Begg's experiment in April, 1940 to the time the Lyon's process was adopted in pro-duction at the urging of the United States Navy. Its use by Kodak was urged by the Navy in 1943, but it was not actually adopted until 1944. On February 24, 1941 a report was made by Dr. McLeod, in charge of Kodak's program of coating lenses, on the subject "Proposed Experiments In Coating With Fluoride." This was a resume of the progress of experimental work on coating. It is noteworthy that it made no mention of the idea of heating in vacuum. Another report, dated September 30, 1941, was made by Dr. McRae of the Kodak laboratory on the subject "Report on Progress of Development and Experimental Work in Lens Coating." The methods of hardening discussed in the report were the use of pre-heating by an oxy-hydrogen flame, post-baking and glow discharge. At this time Kodak was still searching for means to improve the ruggedness of evaporated coatings. Post-baking and the use of oxy-hydrogen flame had been abandoned. The method of glow discharge was then regarded as the most promising. No reference was made in that report to the Begg's experiment using heat in the vacuum. For all practical purposes Begg's idea of using heat in the vacuum had been abandoned. Early in 1943 Lyon's successful use of heat in the vacuum at the Naval Gun Factory came to the attention of Kodak officials. Then for the first time the Begg's experiment was reanimated. Beggs left Kodak's employment in August, 1942, more than two years after his experiment in April, 1940. On April 17, 1943, Kodak filed a patent application in the name of Beggs. After the issuance of the Lyon's patent on April 16, 1946, Kodak's Patent Department copied the claims of the Lyon's patent in the pending Begg's application, thus provoking an interference in the Patent Office.

This interference was subsequently settled by a written agreement dated October 23, 1947 between Kodak and Lyon which provided for the assignment by Kodak to Lyon of the Beggs application,

subject to the reservation that Kodak should have the irrevocable royalty-free right to operate under the Beggs application and any patent which might issue thereon, and subject to a non-exclusive royalty-free license to the United States Government under the Beggs application. The agreement also provided for the grant to Kodak of a paid-up non-exclusive license to operate under the Lyon patent. The agreement further provided that Kodak was to supply digests of proposed evidence regarding Begg's claimed invention to the plaintiff's attorney. In accordance with this agreement Kodak did supply digests of the proposed evidence regarding Begg's claimed invention. In the interference it was claimed by Kodak that Beggs had completed the invention early in 1940. Lyon was advised by his attorney that in the light of all the available evidence he had priority as to the invention involved in the interference. The interference was dismissed accordingly. On the evidence at the trial, Lyon's claim to priority over Beggs was justified. There is no support in the evidence for the defendant's charges of fraud on the Patent Office and the public, suppression of evidence as to priority of invention, or secrecy, in connection with the agreement between Lyon and Kodak for the settlement of the issues involved in the interference proceeding.

Neither Hewlett nor Beggs contributed any new information to the art. Their work therefore may not be held to anticipate plaintiff's invention. Metallizing Engineering Co. v. Kenyon, infra, 153 F.2d at page 519.

The defendant contends that the patent is invalid by reason of public use by the Navy and by the plaintiff more than a year prior to the filing of the application for a patent. Lyon made his claimed invention in June, 1941, while in the employment of the United States Navy as a civilian employee at the Naval Gun Factory. He continued in his employment at the Naval Gun Factory conducting further experiments and tests in perfecting the invention and in preparation for production. His application for a patent was filed November 17, 1942. This defense calls for an examination of the nature of plaintiffs use of the invention between June, 1941, the claimed date of invention, and November 17, 1941, one year before the filing of plaintiff's patent application. Lyon was not ready to say in June, 1941 that the coatings produced were such as would suit the needs of the Navy. Tests were required to demonstrate that the coatings would be satisfactory to the Navy, including abrasion tests, soaking the films in water, subjecting the coated lenses to salt sprays and subjecting coated lenses to actual use. Machines had to be designed for use in production. The development was still in an experimental and testing status in the Fall of 1941. All of this development work looked forward to production in 1942. In September, 1941 test coatings were applied to a small number of old World War I binoculars, which were used for such application by arrangement with the Navy officer in charge of the optical shop. These coated instruments were introduced into the assembly line without informing the personnel that the elements were coated. They were handled in the normal routine manner. This test demonstrated successfully the uniformity of the coatings from an optical viewpoint, and gave assurance that the coated elements would stand the normal handling of routine assembly. It was then decided to make a test application of coatings to larger and more complicated instruments. Coatings were accordingly applied to the elements of one of the telescopes in production in the Naval Gun Factory. This test proved successful both as to light transmission and durability of the coatings. By that time, October, 1941, it was decided by officials of the Navy that experimental work had developed as to such a stage as would warrant the placing of the process in production. Funds had to be procured for the purchase of necessary equipment. On October 30, 1941 funds were authorized. By December 30, 1941 a list of items of necessary equipment, which was thereafter to be purchased for production units, had been

prepared. In January, 1942 it was decided to apply the process to a set of optical elements of a submarine periscope. This was done and the test proved successful. In the Summer of 1942 the first production of submarine periscopes with optical elements coated by the Lyon process was had in co-operation with the Kollmorgen Optical Co., the manufacturers of submarine periscopes. All of this work in development of the invention up to the time of first production and for a long period after that, was surrounded by the strictest secrecy under Navy orders and regulations. The patent application was kept in strict secrecy. The plaintiff was ordered by the Commissioner of Patents not to publish or disclose the invention. The plaintiff had no private coating laboratory; he never sold any optical instruments or lenses coated in accordance with the invention. He took no action at all to realize any profit from the invention until after the issuance of the patent in 1946.

It is clear from the evidence that on November 17, 1941 there had been no production at all. The status of the invention at that date was that development had progressed to such a point that funds had been authorized for the purchase of necessary equipment for production units. It was not until December 30, 1941, almost a month and a half later, that a list had been prepared of items of necessary equipment to be purchased for production units, and not until the Summer of 1942 that the first production using the Lyon process took place in coating the elements of submarine periscopes in co-operation with the Kollmorgen Company. Defendant does not make it clear what particular use is claimed to be a public use so as to defeat the patent, but rests its argument on a statement in the brief not substantiated by the proof, that the process was a success from the start and was carried on continuously from June, 1941 throughout the War. From this it argues that the use of a process by a patentee in making and using the process for its intended purpose for more than a year prior to his filing date requires application of the principle of forfeiture to invalidate the patent, even where the use of the process is secret and cannot be ascertained from the product. For its argument it relies on Metallizing Engineering Co. v. Kenyon, 2 Cir., 153 F. 2d 516 and cases approving that decision. That case holds that it is the nature of the inventors use more than one year before filing his application which controls, and if he is using the invention commercially, for profit, his patent is invalid. There is no quarrel with the doctrine. The trouble with the argument is that the facts as to the plaintiff's use and the Navy's use of the invention prior to November 17, 1941, do not fit the doctrine. There was no use at all either by the plaintiff or the Navy prior to November 17, 1941 except experimental use to demonstrate uniformity of the coatings from an optical viewpoint and durability of the coatings.

The plaintiff has a valid patent. The defendant has infringed the patent by its use of the process covered by the patent in its commercial manufacture of optics not made for use of the United States Government.

By amendment allowed at the trial, the plaintiff stated a second cause of action alleging that the defendant acquired its information and knowledge regarding the process covered by the patent under confidential disclosures made to the defendant while the invention was maintained in a secret status by the Navy Department, and that this confidential information was given to the defendant for the sole purpose of allowing the defendant to practice the invention in making optical elements for the Navy, and that the defendant, without obtaining plaintiff's permission, wrongfully made use of such confidential disclosures and proceeded to use such confidential information for its own non-governmental work and thereby profited from such wrongful use and was unjustly enriched thereby at plaintiff's expense. In the original complaint the plaintiff invoked

the jurisdiction of this court upon the ground that the suit was one under the Patent Laws, infringement of U. S. Patent No. 2,398,382, being charged in the complaint. Upon amending the complaint to state a second cause of action, no other ground of jurisdiction was stated. Regardless of that, I think that the second cause of action may fairly be construed to assert a claim of unfair competition related to the cause of action for patent infringement, and that this court has jurisdiction thereof under 28 U.S.C.A. § 1338(b).

 Defendant's use of the process in its non-governmental work commenced at about the time that the plaintiff wrote the defendant calling its attention to the fact that he had received a patent. From the time of the issuance of the patent the information regarding the process was public knowledge. Therefore the use by the defendant of the process after the issuance of the patent was not wrongful, apart from the risk of infringement. Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, 924. It is true that the defendant became skilled in the operation of plaintiff's process prior to the grant of the patent, and that this circumstance gave the defendant the advantage of being able to commence promptly to use the process on its non-governmental work. This advantage, however, so acquired was an unavoidable incident to the lawful use of the process by the defendant in performing its government contracts for the manufacture of the optics for the Navy. Since there was no unlawful use of the process prior to the issuance of the patent, the defendant may not be held to have been unjustly enriched by making use of confidential disclosures regarding the process.

The plaintiff should have judgment providing for; an injunction against further infringement by the defendant; an accounting for profits and damages resulting from the infringement; ordinary taxable costs. Separate findings and conclusions are filed herewith.