VICTORIA-VOGUE, Inc., Plaintiff,

v.

VALCOURT, Inc., Defendant.

United States District Court
S. D. New York.
Oct. 11, 1956.

James & Franklin, New York City; Maxwell James, New York City, of counsel, for plaintiff.

S. Stephen Baker and Jack Last, New York City, for defendant.

HERLANDS, District Judge.

The Court will dictate its opinion and decision consisting largely of findings of fact and conclusions of law.

Findings of Fact:

1. The action brought by plaintiff is founded upon two causes of action;

(a) A declaratory judgment to hold the patent in suit not infringed and invalid, and "by the patent in suit" the Court refers to the patent issued to Valentine et al., No. 2,337,695, to a "Powder Puff and Method of Making the Same."

In the course of this opinion and decision the suit patent will be referred to and identified as the Valentine patent, which has been marked as Exhibit 1.

(b) The second cause of action is to impose a penalty on the defendant under Section 292 of Title 35 U.S.C.A., the so-called informer's statute, on the ground that the defendant falsely marked its powder puffs with the Valentine patent number in violation of said Section 292.

Plaintiff, Victoria-Vogue, Inc., is a New York corporation, having its principal places of business at 8000 Cooper Avenue, Glendale, New York, and 385 Fifth Avenue, New York City, the latter being within the Southern District of New York.

The defendant Valcourt, Inc., is a New Jersey corporation, having a principal place of business at 100 West 22nd Street, Manhattan, New York, within the Southern District of New York.

In its second amended answer defendant interposed a counterclaim charging plaintiff with having infringed the Valentine patent, and demanding an injunction, an accounting and assessment of costs.

2. Plaintiff began manufacturing its powder puffs (such as Exhibit A–1) in early 1954. In marketing its product, plaintiff encountered reluctance on the part of some of its purchasers who apparently were concerned with the possibility that powder puffs similar to or the same as defendant's powder puffs (such as Exhibit 2–A) might infringe upon the patent in suit. Defendant saw fit not to commence an infringement action against the plaintiff. Plaintiff filed the suit at bar on March 1, 1955.

At this point of the Court's decision and opinion it may be appropriate to describe some of the features of the business of manufacturing and selling powder puffs, and some of the features of powder puffs themselves, all of which matters appear in the record.

The products of the plaintiff are exemplified by such exhibits as Exhibit A–1, Exhibit 3, Exhibit 9, Exhibit 10 and Exhibit 15.

The products of the defendant are exemplified by such exhibits as Exhibit 2–A, Exhibits C, D, E and F.

Products other than plaintiff's or defendant's are exemplified by Exhibit G.

These exhibits illustrate variations in size, color and texture. Powder puffs may roughly be categorized as consisting of either a double faced puff, that is, a puff consisting of two faces, either face being an applicator, or single faced puffs, in which there is one face serving as the applicator and the reverse side being covered with what has been called a closure or satin backing.

Another way of categorizing powder puffs is in terms of the fabric or material out of which the puffs may be made, such as velour or plush, wool, fleece, swansdown, ostrich feathers, et cetera, et cetera. It is evident that to a very considerable and major extent, and the Court finds to a predominant extent, the fuzziness or puffiness of the puff is due to the fabric used, to its pile or thickness, to its ticking, i. e., the number of filaments, fibers or hairs per square inch or other unit, the tigering and finishing of the product, the nature of the filler or stuffing or wadding.

Consequently, the term or concept of "fuzziness" or "puffiness" which, according to the evidence, is a term not used by the practitioners in business, but which is a term that has been used for the purpose of this litigation to describe the qualitative aspect or feel of the applicator parts of the puff, is a variable result depending upon the features to which the Court has just alluded.

It may also be pertinent to add at this point that in the development of this industry, various stages or eras appear. There was the time when two pieces of plush or velour would be faced together with their unfinished back exposed, the edges would be sewn by hand, the two parts turned inside out, having been sewn around to the extent of about nine-tenths, leaving an opening of one-tenth, then stuffing or wadding would be inserted, and after that was done the one-tenth aperture would be sewn or cemented.

It was obviously a time-consuming and expensive operation.

On September 22, 1924, the Curioni patent application was filed. The Curioni patent is Exhibit 5. It is numbered 1,530,547. It was patented on March 24, 1925. A great deal of evidence has gone into the record explaining every possible feature and aspect of the Curi-

oni patent, its specifications, its drawings and its claims.

The Court has meticulously examined the material referred to and the Court's conclusions in regard to the Curioni patent will be set forth hereafter in the course of this opinion.

At this point it need be pointed out that what Curioni stated very broadly he accomplished was to have a method and product whereby the face member of the puff would be placed in a die and wherein the edge of the face member would then become inverted. An intermediate cement disc would be placed on top of the face member or, rather, on the back side of the face member, and then on top of the cement disc or the intermediate member referred to, there would then be placed a closure or backing.

Curioni thus provided for a single faced puff as distinguished from a double faced puff. Curioni thus provided for a single faced puff which had a closure. Curioni thus provided for a closure which would be affixed to the face member by means of thermoadhesive. Curioni thus provided for a mechanism or method which entailed the application of a thermoadhesive to the face member, and what becomes of critical importance in this litigation is just where the thermoadhesive was applied.

On June 23, 1941 application for the Valentine patent, Exhibit 1, was filed. The Valentine patent was patented on December 28, 1943, after two and a half years of prosecution. The defendant is the owner of the Valentine patent by virtue of an assignment duly recorded in the United States Patent Office.

It is appropriate and necessary to define certain terms so that the evidence, the findings and conclusions may be clearer.

Thus the term or expression "face member" means the applicator part of the puff, consisting, for purposes of this case, principally of plush or velour. This face member consisting of velour, when put into the machine, develops a curled edge which then is brought to the back of the puff.

The term "closure" means the satin or other material which is on the reverse side of the puff, that is, on the side opposite the applicator, and it is called a closure because it serves to close the space on the back of the puff, since the curled-up, curled-inward edge of the velour does not completely cover the back side of the puff, and the opening is closed by means of the backing. Hence it is called a closure.

The record is replete with the term "edge" or "periphery." The edge or periphery is referred to variously as the edge or periphery of the face member or elsewhere as the edge or periphery of the closure. As indicated, these terms mean, in regard to the face member, the edge or extreme circumferential part of the puff, measured at its widest part, known as the diameter. The edge of the closure, on the other hand, means the edge of the material which constitutes the backing. Obviously if the diameter of the closure is precisely the same as the diameter of the face member, then the edge of the closure would coincide with the edge of the face member.

A great deal of evidence of a critical nature, so far as the issues are concerned, has been introduced concerning the distance between the edge of the closure and the edge of the face member. Likewise, evidence has been introduced of another spatial concept, namely, a line inside the closure, measured inward from the edge or periphery of the closure.

This leads to the next term, "line of adhesion." Since the closure or backing is affixed to the back side of the puff by a thermoadhesive, the question arises, Just where is the thermoadhesive affixed to the back side of the puff? Is it affixed at a point that coincides with the edge or periphery of the puff? Is it affixed inward from the periphery or edge of the puff? Is it affixed at the edge or periphery of the closure? Is it affixed at a point inward of the edge or periphery of the closure?

These questions indicate a wide range of choice as to the location of lines of adhesion. To a major extent this case turns on the significance, if any, of the exact location of the line of adhesion of the closure member to the face member.

3. Some of the major, specific issues raised in this suit may be stated as follows:

(a) Whether either the plaintiff's puffs or the defendant's puffs embodied the structure or utilized the method of the four claims of the Valentine patent, and whether, on the one hand, plaintiff's puffs, such as Exhibit A–1, infringe the Valentine patent, and whether, on the other hand, defendant's puffs, such as Exhibit 2–A are falsely marked with the number of the Valentine patent. Whether the Valentine patent is invalid for such reasons as the following:

1. That the alleged novelty in claims find no supporting basis in the patent disclosure; that the claims therefore contain what is technically called "new matter" and that they should never have been allowed, and that they are invalid for that reason.

2. That the Valentine patent disclosure itself is fully anticipated by the earlier patent to Curioni and is therefore invalid.

3. That even what is called for in the Valentine patent claims, unsupported as they are by the patent disclosure, does not involve any invention over the Curioni patent, and that therefore the suit claims are also invalid for such reason.

4. As already indicated in a general way, the Valentine patent and its claims relate to a powder puff and to a method of making the same, and as already indicated, the die plunger simply comprises a body or so-called face member designated as "12" on the Valentine patent, Exhibit 1, formed to provide an inwardly curled edge, as shown in Fig. 1 of the Valentine patent, and a top or closure, 18, as appears on the Valentine patent, disposed over the opening of the body or face member, and adhesively secured to the inwardly curled edge, inwardly of the periphery of the puff. As already indicated, the adhesion is by the use of a thermoadhesive coating, indicated by element 19 on the Valentine patent drawings, which is applied to the underside of the top or closure 18, as shown in Fig. 6 of the Valentine patent. The adhesion is obtained by the pressure of a heated die shown as element 20 on the Valentine patent, the heat and pressure being applied, the Court finds, at a marginal portion of the lower part of the heated die, 20, the heat being supplied by the heater wires shown as element 21.

The Court finds that the adhesion is over the rim margin of the top or closure member 18.

There has been great controversy in this case as to the proper interpretation of the drawings and specifications and claims in the Valentine patent. The evidence is not altogether one way, but the Court is clearly and unqualifiedly of the opinion that the interpretation urged by plaintiff is the correct one, and that corelatively, the interpretation urged by the defendant is incorrect. Thus the Court interprets Fig. 1 on the Valentine patent as indicating a closure member of a face member and a line of adhesion which runs from a point inward of the periphery of the closure to the edge of the closure.

The Court regards Figure 2 as indicating that the lip or flap to the left of element 23 is adhered to the back side of the face member, although not as closely or firmly as the point of greatest adhesion, which is at the base of the point indicated as 23, which goes to the actual base of the fabric.

The Court has weighed carefully the well argued position of defendant that there is stippling on Figure 2 which conventionally would indicate adhesive, and that there is no discernible evidence of stippling under the lip to the left of element 23. Yet, the Court is constrained to conclude, and has no hesitation in so doing, that in the light of all of the evidence, which will be referred to in greater detail, the rim area of the closure was pressed down.

For example, with respect to Figures 6 and 7 of the Valentine patent showing the plunger part of the die—I am referring specifically to the arced portion of the die plunger underneath the heater elements which are identified as 21—I am convinced that when the die plunger presses down on the closure member the die plunger comes in contact sufficiently so as to cause the rim portion of the plunger to produce heat and pressure and in turn the rim portion of the closure becomes affixed to the underlying portion of the back side of the puff body. This is particularly illustrated in Figure 7. In other words, the Court finds that under the Valentine disclosure the heat and pressure would be applied to a rim area on the closure, and that no free lip or free flap would be produced, according to the evidence set forth in the drawings.

Finding 5. Coming to the Curioni patent to which reference has already been made by the Court, that patent like the patent in suit is to a powder puff and the method of making the same, and the essence of this patent is a puff facing or body having a peripherally inwardly curled edge 13 as shown on Exhibit 5 disposed over the opening of the said body and adhered to the said inwardly curled edge at a distance inwardly of the periphery of the body of the puff as clearly shown in Figure 7 of the Curioni drawings, and also in Figures 1 and 3 of the Curioni drawings. The adhesion in Curioni is secured by an upper die 11 having a construction quite similar and working the same way as die 20 shown on the Valentine patent, Exhibit 1. The die being heated throughout, the lower rim of the die makes contact with the entire rim of the closure member 15 of Curioni, and consequently the adhesion of the closure member in Curioni is over a marginal area of the closure member up to the periphery or edge of the closure member.

The Court accepts the interpretation of the Curioni patent urged by plaintiff. The Court rejects the interpretation of the Curioni patent urged by defendant.

As in the case of the interpretation of the Valentine patent, one cannot be dogmatic. But upon a careful and analytical evaluation and analysis of the evidence consisting of the drawings, the specifications, the claims and all of the other evidence in the case as to the method, function and structure used in the manufacture of puffs the Court believes that the finding just dictated as Finding 5 is in accord with the preponderant weight of the credible and convincing evidence.

One other observation should be added in view of the earnestness with which counsel have debated the point, and that is that all of these patent drawings are not working plans or working blueprints or scale drawings or photographs. They are not intended to represent precise, meticulously correct reproduction of the matters therein set forth. They are intended to show essential characteristics and functions and construction and mechanical principles in their basic significance and import. It is clear to the Court that the die plunger in Curioni must impress the thermoadhesive on a rim area of the closure member because there is some material of the face member outward of the periphery of the closure, such material of the face member being in both the left and the right grooves as pictorially represented in Figure 1 of Curioni; and in that extra side material of the face member is contained the thin needlelike wire or spring; and the fact that there is a differential space between the periphery of the closure and the periphery of the puff is further indicated by Figures 3 and 7 on Curioni.

Finding 6. For over two years during the prosecution of the application of the Valentine patent, the method and product claims that the applicants made were repeatedly rejected as being met fully by the Curioni patent. The Court has examined the file wrapper history, Exhibit 6. Indeed the Court has read Exhibit 6 a number of times. Even if Mr. Shapiro's (plaintiff's expert's) testimony had not been in the record the Court would have reached the conclusions and findings

herein set forth. That comment is made to indicate that the plaintiff's contentions are so clear and well founded that even without the aid of expert testimony such as given by Mr. Shapiro the Court could have reached the same conclusion.

It appears from Exhibit 6, the file wrapper history, that when the patent examiner warned the applicants to prepare for a final rejection of such claims the original method claims (claims 4 and 5) were amended. At that point two new product claims were made, viz., claims 16 and 17. These new product claims recited for the first time that the adhesion of the top or closure to the curled edge of the puff was inwardly or on a line inwardly of the periphery of the *closure*. Thereupon these claims were allowed by the patent examiner, and these claims are suit method claims 3 and 4 and suit product claims 1 and 2.

Finding 7. Previous to the making of these claims with this new recital, applicants' claims which were rejected by the patent examiner contained the recital that the "edge whereof (the top closure member) is spaced inwardly from the curled portion of the first said part (the puff material) and secured entirely around the same \* \* \*" (See original product claim 3).

In rejecting this original claim 3 the patent examiner evidently found as a matter of fact that the Curioni patent on which the claim was rejected also showed a puff structure in which the closure was adhered to the puff body with the edge of the closure spaced inwardly from the curled edge of the *puff*. Even when for this original product claim 3 the aforesaid new product claim 16 was substituted, in which the recital still was that the closure was "adhered to said edge (the curled edge of the cup-shaped body) at a distance inwardly of the periphery of the cup-shaped body", the examiner refused to allow the claim until it was amended to read that the closure was "adhered to said edge (the curled edge) at a distance inwardly of the periphery of the closure." This claim 16 became patent claim 1. Defendant considers this its broadest claim. The other claims, product claim 2 and method claims 3 and 4, follow the same pattern of Patent Office prosecution.

Finding 8. The examiner, when he rejected the claims, then acted upon the fact finding that in Curioni the closure 15 (Exhibit 5) was adhered to the curled edge of the puff body 13 (Exhibit 5) with the edge of the closure spaced inwardly from the curled edge of the puff. This holding of the patent examiner and his rejection of the referred to claims were acquiesced in by the applicants when they amended their claims and restricted the same to the recital that the adherence was inwardly of the edge of the closure instead of merely inwardly of the edge of the puff body.

Finding 9. In plaintiff's puffs (Exhibit A-1) and in the defendant's puffs Exhibit 2-A) the adhesion of the closure to the curled edge of the puff body is also along a rim area of the closure (and up to and including the cover edge) with the edge of the closure spaced inwardly from the curled edge of the puff, as it is in the manner thus found by the patent examiner to be in the Curioni patent. The Court finds that in neither plaintiff's puffs nor the defendant's puffs is such adherence inwardly or on a line inwardly of the edge of the closure, as distinguished from the way the patent examiner found it to be in Curioni.

Finding 10. Defendant now contends that in Curioni (contrary to the patent examiner's holding and rejection and contrary to the patent applicants' acquiescence to such holding and rejection) the adherence of the closure is such that the adhered edge of the closure is at the *edge* of the puff body, as distinguished from being *inwardly* of the edge of the puff body. The Court finds that the defendant is now estopped by the proceedings in the Patent Office under the familiar doctrine of file wrapper estoppel. Defendant has made this contention for the purpose of seeking an interpretation of their claims, to distinguish them from Curioni on the basis that while in Curioni the adhesion of the edge of the clo-

sure is allegedly to the *edge* of the puff, in the Valentine patent the adherence of the closure is inwardly of the edge of the puff. However, the Court finds and concludes that the defendant is estopped by the Patent Office proceedings under the doctrine of file wrapper estoppel from advancing this interpretation in this case.

Finding 11. Because of file wrapper estoppel, the patent claims must be construed to mean that the adherence is *inwardly* (as distinguished from *up to* as in Curioni) the edge of the closure, in the sense that there is a free flap on the closure outwardly of the line of adhesion, for in both its patent and in Curioni (the latter as held in the Patent Office) the edge of the closure is inwardly of the edge of the puff. Since in the plaintiff's puff and in the defendant's puff the structure is that of the Curioni patent—as interpreted by the patent examiner—and is not as differently claimed in the Valentine patent, plaintiff's puffs do not infringe the Valentine patent, and defendant's puffs do not use the alleged invention of the Valentine patent.

The doctrine of file wrapper estoppel precludes defendant, under the facts disclosed by the credible and more convincing evidence, from relying on the doctrine of equivalents. The case of I. T. S. Rubber Co. v. Essex Rubber Co., 1926, 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335, involved a file wrapper defense. At pages 444 to 445 of 272 U.S., at page 141 of 47 S.Ct. Mr. Justice Sanford said for a unanimous court:

"It results that as the claims in suit were limited by the proceedings in the Patent Office to the specific form of a three-point contact lift, they are not infringed by the heels made by the Essex Company, which are not three-point contact lifts, * * *. Nor can they be held to be infringements even if we assume that, as asserted, they function in the same manner as three-point contact lifts, and would infringe, as was conceded in the District Court, if the claims were not restricted by the limiting clause and were entitled to a construction warranting a wide range of equiv-

alents. By the limitation of the claims in the Patent Office proceeding to the three-point contact lift the patentee made this precise form a material element, and having thus narrowed the claims, cannot, as was said in the Weber Electric Co. Case [Weber Elec. Co. v. Freeman Elec. Co., 256 U.S. 668, 677, 41 S.Ct. 600, 65 L.Ed. 1162], now enlarge their scope by a resort to the doctrine of equivalents. This would render nugatory the specific limitation."

In Tampax, Inc., v. Personal Products Corporation, 2 Cir., 1941, 123 F.2d 722, at page 723, the Circuit Court of Appeals, in a per curiam opinion said:

"The doctrine of 'file-wrapper estoppel' depends upon the fact that, when an applicant has accepted the rejection of a broad claim, he may not later assert that another claim, deliberately restricted to secure its allowance, is its equivalent; * * * *".

■ Applying the foregoing, well settled principles to the facts in the case at bar, the Court has no doubt in concluding that the doctrine of file wrapper estoppel is precisely applicable to this case.

Defendant has argued that the free marginal edge is of no importance; that the important thing is that the line of adhesion is far inwardly of the rounded edge of the puff so as to leave such rounded edge perfectly available for powder puff action; and that defendant considers this free marginal edge of the closure unnecessary.

The foregoing is an almost exact quotation from the defendant's trial brief.

The answers to that argument are:

If the important features were that the line of adhesion were far inwardly of the rounded edge of the puff, as the defendant now contends, then Valentine claim 1 does not define the intended invention and is therefore invalid on this ground as well, since claim 1 is broad enough to cover a puff in which the line of adhesion is not only not far inwardly but is not even inwardly of the edge of the puff.

Moreover, and more importantly, the defendant, by making this statement, points to the clear invalidity of the patent. If the free marginal edge of the closure is of no importance and is unnecessary and could be cut away (which would make it exactly the same as the Curioni patent), then there is absolutely no point to any of the claims in suit and all of the claims are therefore clearly invalid for this reason as well.

Finding 12. From the evidence in the case, I find that the patent examiner's understanding and interpretation of the Curioni patent were correct; that the plaintiff's puffs and defendant's puffs follow the teachings of Curioni and do not follow Valentine, and that in these puffs, while the adhesion is inwardly of the edge of the *puff*, it is not inwardly of the closure, in the sense of the patent, and that therefore plaintiff's puffs do not infringe the Valentine patent and defendant's puffs do not employ the alleged invention of the Valentine patent.

Finding 13. From the evidence in this case I further find that in the original specifications and drawings of the Valentine application, the adhesion of the closure to the puff body was over the rim margin, i. e., the full rim margin of the closure, as well as being inwardly of the edge of the puff; that this was not different in any material respect from the structure of the puff of the Curioni patent, and that therefore there was no novelty in the original disclosure of the Valentine patent over what is found in Curioni.

With respect to the issue of invalidity, the defendant relies mainly on Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, affirming in part D.C. W.D.N.Y.1953, 119 F.Supp. 42.

The Bausch-Lomb case has been commonly referred to as having set up a relaxed standard of inventiveness. However, the doctrinal trend in this circuit, as indicated by four very recent cases handed down by the Court of Appeals, shows that, even giving the doctrine of Bausch-Lomb the utmost liberality, it would not apply here to save the Valentine patent.

In the Bausch-Lomb case, Circuit Judge Hand pointed out that in order to have an invention, there must be a degree of skill and ingenuity beyond that possessed by the work of a mechanic skilled in the art—that the distinction is between an inventor and a mechanic.

On April 9, 1956, the Court of Appeals, in the Helene Curtis Industry, Inc., v. Sales Affiliates, Inc., case, reported in 2 Cir., 233 F.2d 148, dealt with the doctrine of criticality. In fact, the opinion of Circuit Judge Hincks is probably a modern classic in its analysis of the whole concept and doctrine of criticality, and there is much that is said in that opinion and its quotation of the report of Hon. Simon H. Rifkind, who was Special Master, that throws light on one of the problems in the case at bar, for here too the question arises with respect to the "critical" location of the line of adhesion on the back of the face member, and its vital location—whether it is near the edge or periphery of the body member, or how far inward from the periphery of the body member, or whether it is at the edge or periphery of the closure or whether it is inward from the periphery of the closure, and if so, where, is left hanging in the air. It is vague. It is indefinite. There are no definable limits. There is no attempt geographically, if I may use that word, to locate the critical point at which the line of adhesion becomes the flash of discovery, that sudden insight of genius, that critical point where a seemingly "trivial variant" may, as Judge Learned Hand points out, amount to invention.

As far as I have been able to determine—and I have searched the record backward and forward—there is hardly any justification for invoking the doctrine of criticality.

We come to the case of Wilson Athletic Goods Manufacturing Co., Inc., v. Kennedy Sporting Goods Co., Inc., recorded in 233 F.2d 280, 284, decided May 8, 1950, by our Court of Appeals. There Judge Brennan of the Northern District

of New York found that claims in suit were invalid for want of invention and for anticipation, and he was affirmed. Again, Circuit Judge Hincks wrote one of his characteristically acute and brilliant opinions, and pointed out that trivial variations in the art do not constitute invention, and he there held that the allegedly new items were obvious to one of ordinary skill in the manufacture of the particular goods involved, and he held that the claims in suit were lacking in patentable invention and that they were, in fact, anticipated. Judge Hincks also said, "Certainly, this is not a case in which evidence of commercial success tips the balance on the issue of invention [citing numerous cases.]"

The language is apposite to the case at bar.

We then come to Welsh Mfg. Co. v. Sunwear Products Co., 2 Cir., 236 F.2d 225, by the Court of Appeals for this circuit, in which an order by Judge Rice dismissing an action brought for patent infringement and finding the patent invalid, was affirmed. Circuit Judge Lumbard wrote the opinion for a unanimous court. There too he found that in the case under consideration, the alleged invention was in fact a common expedient known to skilled mechanics.

Then he went on to point out that even under the relaxed standard of invention set down in the Bausch-Lomb case, there was no invention. And Circuit Judge Lumbard said, "It is not enough to show that the patentee's device was new and useful. It must in addition be an innovation which was not ' "obvious * * * to a person having ordinary skill in the art." ' "

And in his concluding remarks Circuit Judge Lumbard said, "Nor does the alleged commercial success of the device aid the plaintiff. Although many sun glasses embodying the plaintiff's structure have been sold, there is no evidence of the extent, if any, to which the new structure contributed to those sales [citation.] In any event this is not a case where the commercial success of the de-

vice would tip the scales in favor of invention [citing cases.]"

Those words are apposite to the case at bar.

Finally we come to the most recent decision of the Court of Appeals in this circuit, the Magnus Harmonica Corporation case, Magnus Harmonica Corp. v. Lapin Products, Inc., 2 Cir., 236 F. 2d 285, 286, in which the Court of Appeals reversed the District Court and declared the patent there to be invalid, and again Circuit Judge Lumbard referred to "the relaxed test of invention," as expressed in the Bausch-Lomb case.

Notwithstanding that Judge Lumbard concluded that there was no invention in the particular case.

The reading of these cases leaves me with the very real and definite impression that the Court of Appeals in this circuit will not lend judicial sanction to trivial and unimportant and unreal claims of invention, when in fact they simply embody mechanical improvements which do not involve any real or genuine inventive faculty or truly novel concepts. That may explain the phrase appropriately used by defense counsel in his summation, when he referred to the "high mortality rate of inventions," although he was not applying that argument to the case at bar.

In view of all of the foregoing, and assuming arguendo that defendant's interpretation of the facts is correct, there is no reason for concluding that causing the closure to adhere to the curled over edge of the puff at a region more inwardly than that of the Curioni patent (even assuming the correctness of defendant's interpretation of the Curioni), involves any invention whatsoever. Accordingly, the Court finds that the Valentine patent is invalid for want of novelty and invention. The ordinary or regular presumption of validity of patents is here clearly and definitely rebutted and overcome by the clear and convincing evidence.

Finding 14. I find that the mandatory recitals in the Valentine claims, namely,

that the adhesion is on a line inwardly of the closure or that there is a free flap outwardly from this line of adhesion, referred to in the prosecution of the application in order to secure allowance of the claims, find no basis in and is indeed a departure from what is contained in the original specifications and the drawings. The Court therefore finds that such amendatory recitals constitute "new matter."

■ Finding 15. The Court has already referred to the inapplicability of the doctrine of equivalents. To this the Court adds the following *observation and finding*: Defendant contends that if not within the precise words of the Valentine claims, plaintiff employs an equivalent to that shown in the Valentine patent in that plaintiff has merely removed or eliminated the free flap which extended outwardly from the line of adhesion of the patent. Elimination of such a free flap (assuming for the sake of argument that there is a free flap) however results in the structure of the Curioni patent. The suit claims cannot thus be construed to read on the prior art of Curioni patent, and defendant, having accepted the rejection of the broad claims reading on Curioni, cannot now resort to the doctrine of equivalents for its narrow claims.

Finding 16. Defendant, in order to equate the puff of the suit patent with the puffs here involved, claims that the free marginal edge is of no importance, that it is unnecessary and could be cut away and perform no function; that what is important is that the line of adhesion be inwardly of the edge of the puff. However, the latter is found in Curioni and therefore there is no novelty in the Valentine patent.

Moreover, if the free marginal edge is of no importance, as defendant contends, then there is no point to the line of adhesion being inwardly of the edge of the *closure*. Consequently there is no invention in the claimed novelty over Curioni.

Finding 17. With respect to the evidence concerning the commercial success of defendant's product, defendant argues that its patented product has met with great success and that, to quote defense counsel, it may therefore be presumed that its success is due to its improved function, which is directly attributable to the construction coming under the claims of the patent.

The Court does not regard that contention as sound for the following reasons:

(1) Defendant's product is unlike what is said to be shown in and what is claimed in the Valentine patent because the closure on defendant's puff is not adhered to the curled-over edge on a line inwardly of the periphery of the *closure*. In the light of the file wrapper interpretation of the Valentine claims, no success therefore can be attributed to the patented claimed device.

■ (2) Moreover, while success is some evidence of invention, it is not a substitute for invention. I have already quoted from some of the recent cases.

(3) The evidence on the issue of the commercial success of defendant's product is somewhat equivocal. The testimony of Mr. Richard, defendant's president, was rather glib and facile, and while the Court does not question Mr. Richard's sincerity and his integrity (indeed, the Court respects Mr. Richard), nevertheless, the offhand way in which he generalized loosely about large and important percentages, without there being any documentary or statistical or other supporting material, hardly commends such testimony as the basis for an important finding. Apparently there is no trade organization or trade association for powder puff manufacturers, so that no trade statistics are kept. All through the trial the Court indicated or suggested the possibility of official statistics, and none was produced. Perhaps none was available. There have been no trade magazines or journals forthcoming. Perhaps none was available. Witnesses in the trade who might give evi-

dence of a competent nature based on personal knowledge as distinguished from hearsay were not produced. Not a single manufacturer of powder puffs or compact powder or manufacturer of compacts or anybody actually having firsthand knowledge, was produced.

The Court has not completely rejected Mr. Richard's evidence with regard to the commercial success. Indeed, Mr. Richard's business is apparently very successful, but there is an absence of that persuasive and convincing character of the percentages cited by Mr. Richard that would serve as decisive evidence in this case. Under such circumstances, the issue of commercial success does not warrant its being dispositive on the issue of invention. Moreover, even if one were to assume the correctness of Mr. Richard's testimony on percentages and statistics, that evidence is diluted and much of its force is evaporated by the other evidence in the case that to a major extent such success is attributable to a demand which arose long after defendant's puffs were first sold.

During the years 1945, '46, '47 and '48, only $4,500 a year of defendant's puffs were sold, to Mr. Richard's knowledge, according to his sales. For the years 1949, 1950 and 1951, his sales of the puffs in suit amounted to $9,000 a year. These figures are most modest. What happened was that the powder industry was revolutionized due to the introduction of cake powder or pressed powder. This created a new branch of the industry. Instead of having loose face powder in boxes, women started to use compressed powder or cake powder which was contained in compacts made of metal or plastic. This called for small powder puffs because the powder puffs were furnished by the cosmetic specialty manufacturers together with the cake powder, and consequently a thin, wafer-like puff was required. That made it necessary to utilize the single faced puff with the satin backing, and that produced a tremendous demand for the single faced powder puff of a wafer-like character.

The evidence shows that seven large manufacturers and 75 smaller manufacturers are now engaged in manufacturing compressed powder compacts. Each one of these compacts needs a powder puff, and hence the increased demand for the defendant's product may be attributed rationally to the fact that there has grown up this new industry. If that is true, and the Court considers that to be true, these would be extraneous factors over and beyond the alleged invention and novelty of the defendant's product to account for its commercial success.

In any event, it is a sufficient modifying factor to take the sharp edge off the argument of commercial success as a dispositive or decisive desideratum.

■ Finding 18. I now come to the issue of false marking. Assuming in view of all the foregoing findings that the defendant improperly placed the Valentine patent number on its articles, an assumption that is now the fact and the law by virtue of the Court's invalidation of the Valentine patent, it is not every improper marking of that kind that falls within the denunciation of U.S. Code Annotated Title 35, § 292. The inhibition extends only to those false markings that are " 'for the purpose of deceiving the public' ", Connecticut Telephone & Electric Co. v. Automotive Equipment Co., D.C.N.J., 1926, 14 F.2d 957, 969, affirmed, 3 Cir., 1927, 19 F.2d 990.

■ I find that the defendant acting in good faith on the advice of counsel, in the belief that its patent gave it such right, and not " 'for the purpose of deceiving the public' " did what it did. Plaintiff has failed to establish by the weight of credible evidence that the defendant had the specific intent required by Section 292.

■ In making the foregoing finding I have acted on the premise that plaintiff, although a corporation, qualified as a "person" within the meaning of Section 292. The defendant has cited Forest R. Etling, Inc., v. Weather Seal, Inc.,

D.C.N.D.Ohio, 1944, 58 F.Supp. 269, in support of the proposition that only a natural person as distinguished from a corporation is authorized to bring the informer action under Section 292. The Etling case indeed so holds. With great deference to District Judge Jones, who decided that case, I am constrained to adopt a contrary construction of the statute. First, attention is called to the apparently only other case in which a corporation, acting as informer, sued under Section 292, namely, Connecticut Telephone & Electric Co. v. Automotive Equipment Co. previously cited. There the informer action was represented by a counterclaim in an equity suit brought for infringement. The counterclaim, however, was dismissed on the ground that the penalty prescribed by Revised Statutes, § 4901 (now Section 292) could not be recovered on an equitable counterclaim, but only in an action at law. As noted, the case was affirmed, but not on the issue now before me. Apparently the question of the standing of a corporation to sue was not raised. The case is, however, of incidental interest in view of Judge Jones' statement, at page 269 in the Etling case, that no case has been found under this section which was not by a plaintiff persona est homo.

Secondly, on the substantive merits of the question I see no reason for limiting the word "person" to a natural person. Moreover, the distinction suggested in the Etling case is largely one of form and not of substance, for it would be a simple matter to have a person who is an officer, director or agent or otherwise connected with the corporation to serve as the plaintiff-informer. With the great growth of the corporate form of doing business it would be more realistic to permit a corporate-plaintiff to serve as the plaintiff-informer. In the final analysis the informer type of action is merely a law enforcement technique to promote compliance with the patent statute. To eliminate corporate informers or create procedural roadblocks would tend to obstruct law enforcement. My finding in favor of the

defendant, therefore, on the false marking cause of action is therefore on the merits, after having considered the plaintiff a proper person to bring such an action.

19. I now come to the issue of the charge of plaintiff's unclean hands. The Court rules against the defendant on its contention that the plaintiff has come into court with unclean hands. The Court has carefully evaluated all of the evidence, has analyzed the testimony of Mr. Pomerantz, representing the plaintiff, and Mr. Richard, representing the defendant. I have examined the indemnification letters which are marked as exhibits. I have considered all of the pertinent evidence and credibility of the witnesses, and I have come to the conclusion that there was neither any conspiracy on the part of the plaintiff together with any other persons, nor did the plaintiff attempt to compound a crime or a quasi-penal violation, nor has the plaintiff in any other way acted with "unclean hands." As already indicated, the plaintiff was confronted with a trade situation. Apparently the plaintiff felt that his customers or prospective customers were reluctant or hesitant about buying plaintiff's products due to statements possibly emanating from the defendant that they might be charged with infringement lawsuits; whereupon Mr. Pomerantz of the plaintiff came to Mr. Richard, representing the defendant, both gentlemen having been friendly, and tried to negotiate some kind of a realistic adjustment of the problem. The evidence indicates that Mr. Pomerantz stated, in effect, that in the absence of a license under the patent to rectify the situation created in the trade plaintiff would have to file a declaratory judgement action for non-infringement and invalidity; that to avoid this litigation plaintiff asked for a free license to the patent and he asked for a free license because he had been advised by his attorneys that the Valentine patent was worthless, that Mr. Pomerantz was sincere in his desire to avoid litigation, was sincere in his interest to free his

customers from their fear of purchasing the plaintiff's non-infringing product, was probably just as desirous as Mr. Richard of avoiding litigation, all its inconveniences, uncertainties and expense, and felt that if they got together the defendant would be protected because he would still have his patent, the plaintiff would be protected because he would be able to advise his customers that they would not be exposed to lawsuits.

Conclusions of Law:

1. The Court has jurisdiction over the subject matter of this litigation and the parties thereto.

2. Claims 1 to 4 inclusive of the Valentine patent are not infringed by the plaintiff's puffs or plaintiff's manufacture of such puffs.

3. The alleged invention of Valentine claims 1 to 4 is not employed in defendant's puffs or in defendant's manufacture of such puffs.

4. The Valentine patent is anticipated in all material respects by and possesses no novelty over the earlier patent to Curioni and therefore the Valentine patent is invalid.

5. The alleged novelty in the claims of the Valentine et al patent having reference to an area or line of adhesion inwardly of the edge of the closure finds no supporting basis in the patent disclosure as originally filed in the Patent Office and therefore constitutes "new matter"; and the claims are accordingly invalid on this ground.

6. The subject matter of the Valentine claims based on defendant's contention that the invention of the Valentine patent resided in placing the area or line of adhesion more inwardly of the closure edge than defendant says it is in the Curioni patent does not amount to any invention over the Curioni patent; and the suit claims are invalid on this ground. All of the grounds of invalidity are independent of each other, as stated in this decision and opinion.

7. Defendant has not falsely marked the puffs of its manufacture and sale by marking the same with a notice of the Valentine patent within the meaning of Title 35 U.S.C.A. § 292.

8. The Court denies defendant's motion to dismiss the first cause of action of the complaint.

9. The Court grants defendant's motion to dismiss the second cause of action of the complaint for plaintiff's failure to prove the necessary specific intent on defendant's part.

10. The Court grants the plaintiff a judgment under the first cause of action, declaring and adjudging (a) that letters patent No. 2,337,695 are invalid and void and (b) that the products manufactured and sold by the plaintiff do not infringe U. S. Letters Patent No. 2,337,-695.

11. The Court's judgment will also dismiss the defendant's counterclaim on the merits. In this connection the Court denies defendant's motion to discontinue the counterclaim without prejudice.

12. The judgment will provide for the allowance of ordinary costs in favor of plaintiff.

13. On five days' notice either party may submit such additional or supplemental findings of fact or conclusions of law not inconsistent with the Court's decision, as such party may deem necessary or appropriate.

14. Submit judgment on five days' notice of settlement.