**JOHN BLUE COMPANY, Incorporated, a corporation, Plaintiff,**

v.

**DEMPSTER MILL MFG. CO., a corporation, Defendant.**

**Civ. A. No. 35–55.**

United States District Court
D. Nebraska.

Dec. 30, 1958.

---

42. Plaintiff's Exhibit 1, p. 116, RXQ 603.

C. Willard Hayes and David E. Varner (of Cushman, Darby & Cushman), Washington, D. C., Crawford, Garvey, Comstock & Nye, Omaha, Neb., for plaintiff.

Ferd Bing (of Mann, Brown & McWilliams), Chicago, Ill., Hale McCown (of Hevelone, McCown & Wullschleger), Beatrice, Neb., for defendant.

VAN PELT, District Judge.

Plaintiff, an Alabama corporation, brings this action against defendant, a Nebraska corporation, alleging by complaint and supplemental complaint, infringement by defendant of two United

States Letters Patent, No. 2,696,785, issued to John Blue, and to which the name of Douglas Johnston was later added as a joint inventor and which has been assigned to plaintiff (herein called plaintiff's first patent) and No. 2,771,846, issued to plaintiff as assignee of inventors Donelson B. Horton and Douglas Johnston (herein called plaintiff's second patent).

The patents in suit and above described relate to a device for the metering and regulation of the flow of anhydrous ammonia as it is applied to the soil. Plaintiff is also the owner of an earlier patent not directly involved in this suit, being No. 2,594,284. Defendant has applied for a patent on its alleged infringing apparatus (see Ex. 37).

This is known to the farmer as tractor mounted equipment. For details as to the mounting and use see Exhibit 18. See Exhibit 3 for the machine of another manufacturer not in suit here. See also page 100 of Exhibit 4. Exhibits 2, 5–10 and 5–11 are instructive as to ammonia as a source of nitrogen and are bulletins describing the results of experimentation at Mississippi State College.

Plaintiff prior to 1948 was an old and respected manufacturer of wheel-driven distributors for dry or solid fertilizers. This machinery, usually of the side dresser variety, could be pulled by tractor or animals and plaintiff found most of its business in the cotton fields.

Defendant was also an old and respected manufacturer of farm equipment and particularly of pumps, tanks and windmills. From 1951 or 1952 to 1954 defendant manufactured a tractor mounted device to apply ammonia to the soil that used the metering pump manufactured by plaintiff. Plaintiff purchased from defendant, for a time, the chassis for a trailer-type applicator. An officer of plaintiff put it, that out of a $1,000 rig plaintiff was buying from defendant "about $70 of equipment". Defendant for a time wholesaled plaintiff's equipment, a part of which, as just indicated, defendant made for plaintiff. Later defendant brought out its own line of equipment using the Blue pump. Although the relationship between plaintiff and defendant was terminated effective June 1, 1954, defendant was allowed to buy 225 extra pumps to carry it through October of that year. In late 1954 or early 1955 defendant brought out its pump involved herein. When plaintiff learned of it, it purchased Exhibit 17, which admittedly is a model of defendant's pump. It was cut away in plaintiff's plant so the interior can be seen. The complaint herein was the result of plaintiff's investigation of the pump.

### Infringement

At the pretrial conference the parties agreed that the issues involved both validity and infringement. The Court in the pretrial report, set the case for trial on the issues of validity and infringement only and ordered that the accounting of damages and profits, in event of a finding for plaintiff, be continued to a date to be later determined by the Court.

Plaintiff announced at the pretrial that it would rely upon Claims 1, 2, 3, 11, 13 and 16 to 21 inclusive as to Patent No. 2,696,785 and all four claims of Patent No. 2,771,846.

In the brief submitted by defendant prior to trial, defendant admitted that, if valid, claims 13, 17, 19, 20 and 21 of Patent No. 2,696,785 are infringed by defendant's Model A pump (p. 31, Trial Brief) and as to plaintiff's second patent that claim 1, if valid, is also infringed (p. 32, Trial Brief). In defendant's brief following the trial, defendant admitted that if valid, claims 1, 2, 3 and 11 of the first patent and claims 2, 3 and 4 of the second patent were infringed by defendant's Model A pump (p. 117, defendant's brief).

This leaves then only claims 16 and 18 of the first patent, the infringement of which is in dispute here.

Claim 16 reads:

"16. The structure defined in claim 13 in which the pressure affected area of the fluid pressure operable means is substantially equal to the area of the outlet check valve

exposed to the pressure within the pumping chamber, whereby said valve is substantially pressure counterbalanced when no pumping pressure exists in said chamber."

Claim 18 reads:

"18. The structure defined in claim 13 in which the pressure-affected area of the fluid pressure operable means is substantially equal to the area of the outlet check valve exposed to the pressure within the pumping chamber so that the pressure-developed forces acting to seat and unseat said valve are substantially counterbalanced when no pump pressure exists in said chamber, including resilient means additionally loading the outlet check valve."

Claim 13 should also be set forth for the purpose of reading claims 16 and 18:

"13. A pump for accurately metering a pressurized normally-gaseous liquid comprising: means defining an expansible pumping chamber having an inlet and an outlet; an inlet check valve and an outlet check valve controlling said inlet and said outlet, respectively; means operable by fluid pressure for loading said outlet check valve independently of the discharge from said outlet; and conduit means for supplying said fluid pressure means with pressure fluid from the source of the pressurized liquid being pumped."

Defendant's position as to claims 16 and 18 is stated by defendant thus:

"Claims 16 and 18 specify particularly that the pressures in opposite directions are applied to 'substantially equal' areas. This is not true in the Dempster pump, Exhibit 17 (R. 526), and this fact of non-infringement is so obvious that it is apparent from an inspection of the cut-away section of Exhibit 17. On the right-hand diaphragm, the entire area is exposed to pressure, while on the left-hand diaphragm, the valve member engages the valve seat and

the pressure area is reduced by the area of the seat.

"The terms of claims 16 and 18 are not satisfied in the Dempster pump, and these claims therefore are not infringed." (P. 116, Defendant's Brief.)

In the trial brief of defendant it was stated:

"As to claims *16 and 18,* non-infringement will be urged because the 'pressure-affected area of the fluid pressure operable means' is not 'substantially equal to the area of the outlet check valve exposed to the pressure within the pumping chamber' as required by these claims." (P. 31.)

Plaintiff states in its reply brief:

"In arguing that claims 16 and 18 of the Blue and Johnston patent are not infringed (Def. Br. p. 116) Defendant conveniently neglects the fact that the pressure-exposed area of the right-hand diaphragm is diminished or reduced by the cross-sectional area of the valve stem (denominated MP–62 in the drawing of Defendant's pump which is Plaintiff's Exhibit 36–3). That stem projects through the pressure chamber within the housing MP–8. From an inspection of the drawing it appears that the cross-sectional area of that stem is only slightly less than the cross-sectional area of the valve seat which reduces the pressure-exposed area of the left-hand diaphragm. Claims 16 and 18 recite that the pressure-affected areas in question are of '*substantially* equal' areas. Since the cross-sectional area of the aforementioned stem of Defendant's pump is 'substantially equal' to that of the valve seat, it is obvious that claims 16 and 18 are also infringed." (Pp. 48, 49.)

There are many definitions of "substantially" in adjudicated patent cases. It has uniformly been held that it does not mean the same as "essentially", and

that it is a relative term to be interpreted in accordance with the context. It has also been said that a thing is substantially the same as another if it performs substantially the same function in substantially the same way to obtain the same result. It seems to the Court that defendant's argument as to the substantially equal areas is too limited. The differences in the areas to which the pressures in opposite directions are applied are not sufficient in the Court's opinion to change the operation or function, with the result that the pressures applied perform substantially the same function in the Dempster machine as in the Blue machine and in substantially the same way, and obtain the same result.

▋ Upon reviewing all the evidence, the Court concludes that all the claims in controversy are infringed, if the patents are valid.

## Ownership

▋ It is the defendant's position that the rights of Douglas Johnston in the patent No. 2,696,785, belong to the General Fluid Machinery Co. and that Johnston had no power to transfer any title or interest to plaintiff. The Court finds, under the evidence presented in this case, that Johnston, by virtue of the agreement providing for reversion to him of his patents in case General Fluid Machinery Co. became bankrupt, did have power to transfer his interest to plaintiff. Thus, by virtue of the assignment by Johnston to plaintiff, it is the proper party to bring this suit. Pursuant to the Court's statement during the trial, the Court announces that reliance upon Exhibit No. 19 was not necessary to the Court's conclusion.

## Validity

We next turn to the question of validity. Consideration must first be given to the state of the art and the agricultural conditions when John Blue gave first consideration to this problem in 1946.

The record in this case supports the finding that much of the early experimentation in the use of anhydrous ammonia as a fertilizer and particularly the experimentation in how to apply it to the soil in known and accurate amounts was carried on by Mississippi State College, particularly at its Delta Experimental Station. Much credit has been given to Dr. Andrews and Professor Edwards, both of the College, for this work. Professor Edwards' deposition is in evidence and the growth of the idea is well recited in Exhibit 2 being Bulletin 448 of the State College issued in June, 1947; in the article from Agricultural Engineering of September, 1947 by the same two gentlemen, Exhibit 5–9, and in Exhibit 5–11, being State College Bulletin No. 451, reprinted in February, 1949 and Exhibit 5–10, being Bulletin No. 482, reprinted in June of 1952. The August, 1948 issue of *Fortune*, Exhibit 4, relates more to the use of anhydrous ammonia than to methods of application. That both Edwards and Andrews well understood the problems created by the use of anhydrous ammonia is shown by the letters they wrote and received in 1944 and 1945 (see Exhibits 5–1 to 5–7 inclusive). Exhibit 5–4 seems to the Court a definite recognition of the problems and is some evidence that prior art had not yet solved it to the satisfaction of these pioneer experimenters. The article in Agricultural Engineering (Exhibit 5–9) stated:

"With a driver operating the tractor and a second man operating the control valve the correct amount of ammonia is assured at all times. The tractor driver stops at the end of each plot and waits until the control valve operator has stabilized the rotor in the rotameter at the correct reading with all applicators feeding."

This shows there was much to be desired in the operation of the machines because the ordinary farmer could not afford to have two men on such a project. The concluding paragraph contains this statement:

"The major consideration in our future machinery development program will be for a more practical farm machine."

In June, 1947 they said:

"When a metering pump has been developed to operate under high pres-

sure ammonia, and suitable for mounting on a tractor, anhydrous ammonia may be applied in a manner similar to that described above for aqua ammonia.

"The one great advantage of the metering pump is that the rate of distribution is timed with ground speed of the tractor." (Ex. 2, p. 19.)

The first paragraph of this statement is in substance repeated in February, 1949 (see Exhibit 5–11, p. 24) and there is reference to calibration of the equipment with a rotameter. By June of 1952, as shown by Exhibit 5–10, they are still discussing calibration equipment and the difficulties of application although on page 34 this statement appears:

"The pump and cooler is another means of controlling the rate of application of ammonia to the soil. It is geared to the tractor and should maintain a constant rate of flow, regardless of changes in ammonia pressures."

In Professor Edwards' deposition his attention was called to this statement:

"Q. On page 34 of Bulletin 482 there appears the following statement: 'The pump and cooler is another means of controlling the rate of application of ammonia to the soil. It is geared to the tractor and should maintain a constant rate of flow regardless of changes in ammonia pressures.' Did that statement refer to a John Blue pump for metering ammonia? A. I am—I couldn't be positive in that statement because that statement was injected in there after considerable research. This bulletin was published in, reprinted in 1952; and it could very well have been referring to a John Blue pump.

"Q. At the time of preparation of this bulletin did you know of any other pump for metering aside from the John Blue? A. I did not." (Deposition, Exhibit 5, p. 33.)

The Court mentions these details in the experimentation and writings of persons not shown to be financially interested in the outcome of this litigation because the problems that confronted Mr. Blue or others engaged in the manufacturing of machinery are well set forth therein and help to convince this Court that there was a need for such machinery as Mr. Blue furnished.

It cannot be successfully contended that Mr. Blue did not devote time and ability to the problem. It is debatable whether the time was his own or that of his employees, individual or corporate, and whether the ideas were his or someone else's. The result was an application filed December 21, 1948 for the securing of a patent not in suit but historically important nevertheless (see Patent No. 2,594,284 issued April 29, 1952, being Exhibit B).

The Court should here give attention to the arguments touched on above as to whether this research and the resulting patents represented the solution of a long-felt need. There has certainly been a long-felt need for machinery to distribute fertilizer. Agriculture has long recognized its value. The potential of anhydrous ammonia if proper application could be made in itself constituted the need.

It has now become recognized by historians that one of the greatest contributions to the settlement of Nebraska and the other plains states was the invention of the windmill, in which Dempster was a pioneer. The homesteader from the East who, desiring free land and his own home, settled our area, probably little recognized the need for a windmill when it was being developed, but it had invention in it nevertheless and there was a need.

The fact that Professor Edwards still uses a valve type of metering in his experimentation is no more persuasive than to urge against a sewing machine invention that some women sew by hand. This Court finds that Blue's machinery filled a real need, though of recent origin. We do not have before us, however, Blue's patent No. 2,594,284. The presence of

a long-felt need for this machinery is not essential to patentability in any event. Its presence may serve to strengthen the conclusion of patentability, but the absence of such a need does not negate patentability.

It is claimed by the defendant that the first patent in suit is invalid because it contains elements suggested solely by one of the patentees while the patent, as reissued, is a joint patent. It is evident from the record, and the Court was impressed in listening to him as a witness, that the plaintiff company added greatly to its engineering knowledge when Douglas Johnston was employed.

It is defendant's contention that the balanced valve and the venting means was put in on Johnston's thought (R. 373 & 374; Defendant's brief pp. 67–69).

From this defendant contends that the patent was void saying that John Blue in 1949 (Exhibit C, pp. 31 & 32) swore he was the sole inventor and after the application was allowed in March, 1954 he again made the same statement (Exhibit C, pp. 68 to 76). Thereafter it was claimed as their joint invention and the patent so reissued and assigned to plaintiff.

█ █ While the Court is inclined to the belief that at this stage Johnston made a greater contribution to the development of the machine to its present stage than John Blue, the Court also recognizes that the defense of lack of joint invention is regarded with disfavor. Klein v. American Casting & Mfg. Corp., 2 Cir., 1937, 87 F.2d 291, 294; Kendall Co. v. Tetley Tea Co., Inc., 1 Cir., 1951, 189 F.2d 558, 562. The Court finds except as to the pressure balanced valve, that it is impossible to separate Johnston's inventive contributions from those of Blue, and since Mr. Johnston believed Blue also contributed to this valve, the Court therefore concludes that Patent No. 2,696,785 is not invalid because of lack of joint inventorship.

The first patent in suit was originally issued in Blue's name as sole inventor. Subsequently, the name of Douglas John-ston was added. The defendant claims that such reissue was not warranted under the statute and that the patent is therefore invalid. Title 35 U.S.C.A. § 256 provides that if a joint inventor was omitted "by error and without deceptive intention on his part," the patent may be reissued adding his name as joint inventor. The facts here are that the patent attorneys when sending the original application to plaintiff company prepared it showing the names of both Blue and Johnston (see Exhibit 15) as inventors. Plaintiff's general manager, W. D. Tucker, removed Johnston's name from the application and had Blue sign it as sole inventor. After the patent was issued and after defendant had been charged with infringement but before this case was filed, counsel again raised the issue and proceedings were had whereby Johnston's name was added as an inventor.

Blue and Tucker claimed when their depositions were first taken that the original application was prepared in the name of John Blue only. After being shown letters to the contrary, Mr. Tucker was asked:

"Q. Mr. Tucker, do you know who was responsible for making the change from the joint application in the name of Johnston and Blue to that of a sole application in the name of Blue alone? A. My memory fails me, but, from this exhibit here, Exhibit 18, it seems like I bear the responsibility for it." (Depositions, June 19, 1956, pp. 186, 187)

His reasons for naming Blue as sole inventor are given on page 222 of the record. It is evident that his instructions to the patent attorneys and his striking of Johnston's name was deliberate. It was not an error in the sense of being unintentional or inadvertent.

The legislative history of the bill and particularly of Section 256 is shown on page 2401 of volume 2, U. S. Code Congressional & Administrative News, 1952, covering the second session of the 82nd Congress. There is copied Sen. Rept.No.1979, June 27, 1952 which re-

peats in substance H.Rept.No.1923, May 12, 1952. It says in part:

"Very often two or three people make an invention together. They must apply as joint inventors. If they make a mistake in determining who are the true inventors, they do so at their peril. This provision permits a bona fide mistake in joining a person as inventor or in failing to join a person as an inventor to be corrected."

The terms "bona fide mistake", and "by error and without deceptive intention" are thus used with the same meaning.

Was Tucker's act an error or mistake? If so, we proceed on to the matter of deception or good faith on Johnston's part. If not an error or mistake, there was no authority in the Commissioner to correct the patent, and it is invalid. In this connection, it is to be observed that at the time of the first notice to defendant of infringement, the patent was, or would have been held invalid if nothing was done to have it reissued, assuming of course that the facts of Johnston's contribution became known and this same defense was raised.

The Court cannot find that Section 256 has been interpreted by the courts. This same language, however, is found elsewhere in the patent law. Section 251 permits reissue of patents when the specifications, drawings or claims were defective "through error without any deceptive intention."

In construing the 1952 amendments codifying the patent laws it is said, and we believe correctly, that the new Section 251 "does not change the sense or substance or the meaning of its predecessor, former Section 64 of Title 35 U.S. C.A." which provided for reissue "if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention." Riley v. Broadway-Hale Stores, D. C., 114 F.Supp. 884, 887, affirmed 9 Cir., 217 F.2d 530. District Judge Hall continues at 889 of 114 F.Supp.:

"Plaintiff was represented by counsel at all times and I cannot possibly see how a deliberate action so taken can be construed as 'error' under the provisions of Sections 251 and 252 of the 1952 Patent Statute. If it was error it was only an error of judgment on her part and her counsel's part. It was not an actual mistake; it was not inadvertence; it was not accident. Such deliberate action has consistently been held not to be error arising through inadvertence, accident or mistake under the previous statute."

He cites Miller v. Bridgeport Brass Co., 104 U.S. 350, at page 355, 26 L.Ed. 783, to the effect that a claim cannot be enlarged on reissue "from a mere error of judgment."

Also supporting this position is the case of Grand Rapids Show Case Co. v. Baker, 6 Cir., 216 F. 341, saying:

"Nor can the deliberate acts of the applicant's attorney in protracted proceedings in the Patent Office leading to the issue of the patent, be treated as the result of inadvertence, accident or mistake. Dobson v. Lees, 137 U.S. [258] 265, 11 S.Ct. 71, 34 L.Ed. 652." 216 F. 351.

In the case of In re Murray, 77 F.2d 651, 22 CCPA 1196, the Court of Customs and Patent Appeals says: "In other words, the reissue statute, in our opinion, was not enacted for the purpose of correcting errors of judgment * * *." 77 F.2d 655.

■ This Court concludes that Tucker's action was only an error of judgment. Conceivably, as defendant urges, he might have considered the possibility of General Fluid Machinery's insolvency; that he did not want Johnston having an interest in the patent or leverage with Mr. Blue because of it. Whatever the reason, and it is immaterial, Tucker, the general manager, having the matter specifically before him by reason of Johnston's name being included on the papers as drawn, chose to disregard what

amounted to the suggestion of counsel who had drawn the application after conference with John Blue and rewrote at least that part of the application. It was not the result of inadvertence, accident or mistake and is not a correctable error, being one of judgment only. For this reason if no other the patent is invalid.

This Court concludes that the deliberate action of Tucker was not an omission by error such as can be corrected under Section 256. It is therefore unnecessary to pass upon whether the omission was without any deceptive intention on Johnston's part. If the Court needed to pass on this issue, it would hold that no deceptive intent on Johnston's part has been proven.

The case has many knotty problems. The next that must be considered goes to the very heart of the plaintiff's case. Prior to the application for the first patent in suit, John Blue had applied for a patent on an ammonia applicator. The object of this patent, No. 2,594,284, was:

"It is also a more specific object of this invention to provide an apparatus which will not only provide an amount of fertilizer varying in accordance with the forward speed of the vehicle employed, but one which will also provide an adjustable amount of fertilizer distribution at a particular speed." (Column 1.)

This result was achieved by using a positive displacement pump which was driven by a sprocket and chain connected to the vehicle wheel so that it operated fast or slow as the vehicle operated fast or slow. It had an adjustment to vary the piston stroke so that the amount of ammonia dispensed with each stroke could be varied. Thus, in accordance with the object stated above a standard amount of ammonia necessary for the particular soil could be dispensed in the usual farming operation.

The Court must now determine whether patent No. 2,696,785 is a patentable invention in view of the earlier invention. This patent describes a machine designed to accomplish the same result as the earlier Blue patent. Column 1 of patent No. 2,696,785 states:

"Furthermore, it is an object of the present invention to provide a positive displacement metering pump which delivers liquid in amounts varying in proportion to the speed of the vehicle to which the apparatus is attached.

"It is a further object of this invention to provide a metering pump which may be adjusted to deliver a variable quantity of liquid at any particular speed of the vehicle."

Although the language refers to liquids generally, it is said in column 1 that it "relates to apparatus for distributing liquids and, more particularly, relates to a metering pump for distributing anhydrous ammonia and other similar liquids useful in agriculture * * *." It is thus evident that both patents are to cover machines which accomplish the same result—accurately metering anhydrous ammonia for use as fertilizer. The means for reaching this result are the same. The only real differences between the two patents are that the one in suit has three additional elements: a heat exchanger, a balanced valve, and a venting arrangement.

The Court must find, as a matter of fact, whether the addition of these improvements constituted a patentable invention, either in the individual elements themselves or as an assembly of elements. A question of law is not involved unless the Court uses an improper standard of invention. Steffan v. Weber Heating & Sheet Metal Company, 8 Cir., 1956, 237 F.2d 601. The proper test is set forth in Title 35 U.S.C.A. § 103 which provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been

obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

It seems to be generally accepted that the Supreme Court has set a higher standard for patentability in the past two or three decades than was formerly the case. In 1955 in the case of Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, 535, certiorari denied 350 U.S. 911, 76 S.Ct. 193, 100 L. Ed. 799, Judge Hand noted that this trend had been noticeable for twenty or twenty-five years preceding codification of the patent laws in 1952. In the case of Trico Products Corp. v. Delman Corp., 180 F.2d 529, 533, the 8th Circuit Court of Appeals, speaking through Judge Sanborn in 1950 stated: "It is, no doubt, true that this Court is applying higher standards than it formerly did for determining whether patented improvements of practical value and which have met with commercial success involve invention or only mechanical skill. * * * The Supreme Court has, we think, raised the standards of originality necessary to sustain patents for improvements such as those involved in the instant cases, regardless of their usefulness or commercial success." The case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 is instructive. The Court said at pages 151–153 of 340 U.S., at page 129 of 71 S.Ct.:

"The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. [of Illinois] v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

In 1952, the patent laws were codified, and it was the opinion of Judge Hand in Lyon v. Bausch & Lomb Optical Co., supra, that Congress in Section 103 intended to and did liberalize the rule of patentability which had become higher by virtue of the Supreme Court rulings. Whatever may be the merit of this position taken by Judge Hand, and by the courts which have followed him, this Court may not follow that rule. In the case of Steffan v. Weber Heating & Sheet Metal Company, 8 Cir., 1956, 237 F.2d 601 Judge Van Oosterhout quoted as applicable in this Circuit the rule of the Great Atlantic & Pacific Tea case. The Lyon case was noted and in connection

therewith it was stated at page 604 of 237 F.2d: "The effect, if any, of section 103 upon standards to be applied in determining validity of patents has not been passed upon by the Supreme Court." From this, and also from the recent case of Briggs & Stratton Corporation v. Clinton Machine Co., Inc., 8 Cir., 1957, 247 F.2d 397, certiorari denied 355 U.S. 914, 78 S.Ct. 344, 2 L.Ed.2d 274, this Court concludes that the rule of the Great Atlantic & Pacific Tea case must be considered when applying the test laid down in Section 103.

Having the above tests in mind, the Court turns to the merits of the case at bar. The heat exchanger is a simple device by which the pipe carrying the ammonia into the pump chamber is run through a bath of the ammonia which is on its way out to the applicators. The outgoing ammonia has a refrigerating effect on the incoming ammonia which tends to keep it in a liquid state and promotes greater accuracy in metering.

The pressure balanced valve is a bypass line from the pumping chamber to a chamber behind the outlet valve. Thus the pressure from the ammonia is the same on both sides of the outlet valve. With the pressure equalized, a relatively light spring holds the valve shut until hit by the piston. If a balanced valve weren't used, a much more powerful spring would be necessary to hold the valve shut when the ammonia pressure built up, and a much more powerful piston thrust would be needed to open the valve. A spring, without this equalized pressure was contemplated in the earlier Blue patent.

The venting device is merely a device to let the air or gaseous ammonia out of the pump chamber, to avoid the problem of vapor lock or gas lock. It also serves to prime the pump with liquid and starts the cooling action of the heat exchanger so that the pump will meter accurately at the beginning of a fertilizer run. It appeared from the testimony that at one time a simple needle valve had been used as a vent, and the actual device described

in the patent was early discarded by Blue.

Thus noting the utility of these three improvements we turn to the prior knowledge of their respective arts:

### The Heat Exchanger

Authorities are not needed that the idea of a heat exchanger was not new when Blue and Johnston began work together. Suffice it to say, as it applies here, that the idea of a heat exchanger on an anhydrous ammonia applicator was known as early as 1948 and was on the device manufactured by the New Holland Company, a name recognized by the Court as the manufacturer of a substantial line of farm equipment used in Nebraska and probably elsewhere. (See testimony of Battle Bell Ewing, R. 73; and Exhibit A, Baggette, et al., patent No. 2,612,760—application filed Dec. 9, 1948.) Kniskern, Patent No. 2,007,251, application dated April 14, 1934, had a heat exchanger among other reasons to "permit heat exchange between ammonia flowing through the coil and that passing through the meter." Ewing in discussing the device on the New Holland machine said:

"Q. Now, in the arrangement used in this New Holland device the incoming ammonia that is approaching the metering device is cooled, isn't it? A. Yes, sir; that's the purpose of the device.

"Q. And it is cooled by the expanded ammonia that has left the metering device, isn't it? A. That's correct, sir." (Pp. 74, 75, Record.)

Other patents are cited by defendant on this point but the Court sees no reason to prolong this opinion with a discussion of them. The heat exchanger was not new to Blue and Johnston and this Court cannot see any inventive genius in the application Blue and Johnston make of it. Nothing was added to the total stock of knowledge by them either in its use or construction. In fact the original application of John Blue said "the heat exchanger 8, * * *

is of conventional construction" (Exhibit C, p. 2738). Substantiating the Court's conclusion, see Boston Metals Co. v. Air Products, Inc., 4 Cir., 193 F.2d 535.

### The Pressure Balanced Valve

This valve is the subject of much dispute in this case. Defendant claims it is Johnston's thought and not Blue's and relies in making this contention on Blue's testimony (R. 167) that he didn't think he told Johnston to put in the equalized valve and on Johnston's testimony (R. 373) that it was put in on his own thought. It appears in Johnston's first drawing. See Exhibit 8, dated April 5, 1948 and bearing name General Fluid Machinery Co. Inc., the company since bankrupt and then headed by Mr. Johnston. The Court does not base its decision on the premise that it was not Blue's idea, though there is support for defendant's claim.

It seems undisputed that it was a substitute for the spring-biased outlet valve of Blue Patent No. 2,594,284.

Johnston was familiar with a balanced valve and its operation. See Johnston's patent No. 2,508,609 (Exhibit 0). The Court would agree that the difficulties to be encountered in a deep well pumping device and a metering device are different but the principle involved in the use of the valve is the same. The use of an old method to produce an old result is not invention. See Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L. Ed. 997. It is true as testified by Koerper that a typical balanced valve cannot be used without change as an outlet valve for the Blue and Johnston pump and that none of the cited prior art used it as an outlet valve of a pump but there is no invention in using it for the first time as an outlet valve. The Court believes that anyone such as Johnston, skilled in engineering arts, when confronted with the problem before him would have solved it with the balanced valve. Johnston stated on cross-examination (R. 362) in connection with this pressure balanced valve that "one of the

best known laws of physics is that a body in balance with opposite forces doesn't move." It also appears that an explanation of a pressure balanced valve appears in a 1941 Engineering Encyclopedia, and in a Mechanical Dictionary published in 1882 which dealt with steam pressure. (R. 486, 487). The Court cannot believe that the utilization of this valve involved anything more than the ordinary skill in the art.

### The Venting

Admittedly, a problem in the use of anhydrous ammonia is the danger of what is commonly called vapor lock or gas lock. Admittedly, venting solves it. The venting in the patent in suit is done by turning the handle 113 allowing the ball valve 111 to rise from its seat 112 and thus allowing gas to be purged from the system. It was also claimed that this purging started the function of the heat exchanger (line 25, column 5, Pat. No. 2,696,785). This was changed in No. 2,771,846 because it caused trouble with leakage and the ball would stick in the seat. The change was to provide a means of opening by hand the outlet valve. This is the lost motion connection hereafter mentioned.

The models in evidence do not contain the venting system originally designed. Exhibit 12 contains an intermediate type of venting by which the machine could be vented by manually pushing the piston with a lever and thereby opening the valve. Exhibit 13 contains the new venting device described in No. 2,771,846.

There was also testimony that the new devices vent through the applicator blades so as to keep the orifices open by blowing trash or dust from the line or orifices.

The Court does not believe there is anything new or novel either in the principle or its application. The fact that it has now been changed, while not significant in determining the patentability of the idea or in determining the validity of the patent at the same time does not cause the Court to feel that there was any spark of genius in the venting method described in the first patent.

In conclusion on the subject of patent No. 2,696,785, the Court concludes that the assembly of three well-known devices to iron out the bugs in the machine described in Blue's earlier patent is not a patentable invention. The inventors have merely brought together segments of prior art. Nothing has been added to the stock of knowledge. To allow a monopoly on this aggregation would diminish the resources available to skillful men. The patent is therefore invalid.

The Second Patent—No. 2,771,846

As indicated above, infringement is admitted, if the patents are valid. As to this patent, defendant claims that pumps having all the elements of No. 2,771,846 were sold by plaintiff more than one year prior to the filing date of the application for this patent.

The application was filed May 17, 1954. We are therefore interested in its development and sale prior to May 17, 1953 because Title 35 U.S.C.A. § 102 is unmistakably clear:

"A person shall be entitled to a patent unless—

\* \* \* \* \* \*

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States \* \* \*."

We are here concerned with two pumps AND and ANDX. Plaintiff says in its reply brief:

"The only difference between AND and ANDX pumps resides in the actuators for their clutch mechanisms. Tucker testified that an AND pump has a manually-operable throw-out lever for the clutch like that on the AND pump in evidence as Plaintiff's Exhibit 13, while an ANDX pump has a hydraulic cylinder operated by remote control, for operating the clutch (R. 255, 256)." (Pp. 37, 38.)

Exhibits 27, 28 and 29 relate to this new pump. Exhibit 27 shows on its face that it was designed June 10, 1952. It shows a complete revision October 31, 1952, the addition of A–358, A–366 and A–362 January 2, 1953 and other revisions, adding A–269 and A–367 on April 30, 1953 and again a revision on December 20, 1955.

Exhibit Q is a notice to John Blue catalog holders; pages 29, 30, 31 and 32 are Parts lists and prices of Model AND. Each page bears date of March, 1953. It is interesting to observe that by this time the shifter rod for both AND and ANDX pumps were separately numbered.

There appears in Exhibit Q a table of speed-up drives and conversion parts bearing the date May, 1953. The day of the month is not shown. Parts are listed for both AND and ANDX models.

It is the contention of plaintiff that in April and May, 1953 AND and ANDX pumps were still in the experimental stage and that the ANDX pump shipped Dempster May 8, 1953 (see Exhibit R–8) was an experimental one. To the Court this is not consistent with the issuance of tables showing the maximum output at different sprocket ratio for twenty different tire sizes using the AND pump. This Court believes the pump was then beyond the experimental stage, and if it was not Exhibit Q–6 would not have been issued.

By June, 1953 (see Exhibit Q, pages 8 to 11) advertising was issued by plaintiff containing cuts showing not only AND but also ANDX pumps and by June 30, 1953 (see Exhibit Q, p. 12 for bulletin issued that date) there was sufficient trouble shown by field reports as to AND and ANDX models as to outline recommended procedure for handling the difficulty. The cause of the trouble was in the springs and new springs by June 30 not only were available but had been shipped to customers prior to that date. It is not reasonable to believe that in June, 1953, field reports would have come in, reporting difficulties in operation sufficient to warrant making new springs and issuing a bulletin as to the trouble, if as Tucker claims, no sales except on an experimental basis were made until after May 25, 1953. The remaining

sheets in Exhibit Q are dated from July, 1953 to October, 1954 and have no evidentiary value on this point.

Plaintiff attempts to explain this preparing of parts manuals, etc. by saying that it is usual to send out a list of parts prior to introducing a new machine.

This becomes important and the Court has referred to Exhibit Q in such detail and will hereafter refer to other evidence, because plaintiff notwithstanding the fact that it had filed a suit asking damages for infringement on August 30, 1955 in which on September 23, 1955 an answer was filed, claims to have destroyed its records in August, 1956.

Even though the supplemental complaint concerning this second patent in suit had not yet been filed, the Court's credulity is somewhat strained to believe that records of sales would be destroyed when the plaintiff knew that it would be called upon to prove damages if its action concerning the first patent in suit was successful. Furthermore, the supplemental complaint concerning this second patent in suit, as to which the sales records are vital, was filed only about five months after the alleged destruction of records. Surely there must have been some contemplation of this suit before it was filed. The Court cannot find, under the circumstances, any legitimate reason for the alleged destruction of these records or that they have been destroyed, unless for the purpose of aiding plaintiff's claim as to production and sale of AND and ANDX pumps.

Exhibit 21 was identified by Mr. Tucker and from it he testified there were no AND or ANDX pumps sold in the fiscal year 1952–53. Thereafter after the examination and cross-examination was over, the Court asked Mr. Tucker as to Exhibit 21.

"Q. I have a question here also, Mr. Tucker, as to Exhibit 21. Is this a recapitulation that you made recently? A. No, sir. This was a running recapitulation that is kept each year, sir, that was introduced in the last deposition of my original—

"Q. Do you mean that the entries in it started in 1945 and 1946? A. Yes, sir.

"Q. And continued on year by year thereafter? A. Yes, sir. (P. 270, Record.)

The Court then asked him how he would know in 1945 that they were going to produce an AND model pump and it developed that this was a photo copy of an original which was later produced. At that time the witness stated, looking at Exhibit 21A, that the figures were brought forward in 1952–53 and that this original sheet was begun in 1952–53 (R. 675). On later examination by the Court he stated that he started to keep this record after the fiscal year ending May 31, 1953 ended. It thus appears that the witness originally intended to have the Court believe that this was an original record, whereas it now appears to have been made up after the date that is here material. As such the Court believes it is not entitled to weight on whether AND and ANDX pumps were manufactured and sold prior to May 17, 1953.

When asked about Exhibit R–11, showing shipment of 25 ANDX pumps to Dempster May 27, 1953, the witness explains that they close their business on the 25th and that invoices dated after that would go into the next month's total.

There is other evidence taken with all the above that convinces this Court that sales on other than an experimental basis were made prior to May 17, 1953.

Exhibits J–1, 2, 3, 4, 5 and 6 concern an order for AND pumps in January, 1953. Exhibit J–4 shows the pumps were to be produced and shipped in late April. Exhibit J–5 shows two models had been furnished in September, 1952 to another company.

Exhibit G–1 is a letter dated May 7, 1953 received by plaintiff from a Bossier City, Louisiana company asking for repair parts for the ANDX pump. The letter helps the Court to believe that plaintiff was in production of the pump at the time rather than in an experi-

mental stage. Exhibit G–2 is a copy of the reply to Exhibit G–1. The Court is convinced from reading this letter that repair parts were shipped more than a year prior to May 17, 1954 and it follows, in the Court's opinion, that if repair parts were being shipped that pumps had been sold and shipped.

Exhibit H is a letter dated May 7, 1953 written by plaintiff, which states definitely that "this week" an entire truck load of implements equipped with a new pump were being sent. While Mr. Tucker attempted to explain this away, the attempt was not convincing to the Court.

Exhibit I is a copy of a letter dated May 8, 1953 to a man in Endicott, Washington, to the effect that the ANDX pumps he had been promised were not being shipped, that they had run out of springs but does show that a considerable line of AND pumps had been run through by that time.

Exhibit R–8 shows the sale of an ANDX pump, serial number 6712, to defendant May 11, 1953 on an order of January 27, 1953, shipment having been made May 8, 1953.

Exhibit R–11 shows the shipment to defendant May 27, 1953 of 25 ANDX pumps with numbers as low as 6755 to as high as 6783. There is no explanation as to what happened with pumps bearing numbers between 6712 and 6755 or the numbers prior to 6712, except the claim that the records are destroyed.

The foregoing represent letters some of which were difficult to be obtained by defendant. From them and the other evidence and from observation of witness Tucker the Court concludes that the records are not destroyed and that they are not produced because they would have shown production and sale of AND and ANDX pumps more than one year prior to the application date of May 17, 1954.

The Court therefore concludes that this patent is not valid by reason of the requirement of Section 102.

An appropriate order will this day be entered.